Scott A. BRODY, ESQS (SB 4148)
BRODY, O'CONNOR & O'CONNOR, ESQS.
Attorneys for Defendant
7 Bayview Avenue
Northport, New York 11768
(631) 261-7778

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JENNIE CARLUCCI,                                                    Docket No.: 12-CV-01432

                                        Plaintiff,

                        -against-

WAL-MART STORES EAST, LP,

                                        Defendant.

------------------------------------------------------------------X

# DEFENDANT'S MOTIONS IN LIMINE

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES........................................................................................... II

I.    FIRST MOTION IN LIMINE TO PRECLUDE EXPERT
      TESTIMONY ON PLAINTIFF'S DAMAGES CLAIMS............................................ 2

      A.    PLAINTIFF'S EXPERT....................................................................... 3

      B.    DEFENDANT'S EXPERT..................................................................... 4

      C.    PLAINTIFF'S DEPOSITION TESTIMONY......................................... 5

      D.    DR. SHUMSKY, LICENSED PSYCHOLOGIST................................. 7

            I.     DR. SHUMSKY'S REPORTS................................................ 7

            II.    DR. SHUMSKY'S DEPOSITION............................................ 7

      E.    DR. MCCOY REPORT AND LIFE CARE PLAN................................11

            I.     MCCOY REPORT.................................................................. 11

            II.    MCCOY DEPOSITION........................................................... 12

      F.    DR. BRIAN GREENWALD.................................................................. 15

      G.    REPORT OF ECONOMIC LOSS BY DR. KENNETT...................... 16

      H.    PLAINTIFF'S PRIOR TREATMENT, HER CT SCAN, AND DR. MA........... 17

      I.    DEFENSE EXPERT, DR. WILLIAM BARR...................................... 20

      J.    DEFENSE EXPERT, DR. RONALD SILVERMAN........................... 21

      K.    DEFENSE EXPERT, CHARLES A. KINCAID.................................. 21

      L.    LEGAL STANDARD UNDER DAUBERT.......................................... 22

      M.    APPLICABLE NEW YORK LAW ON CAUSATION........................... 26

      N.    DR. SHUMSKY, DR.GREENWALD AND  DR. McCOY MUST BE
            PRECLUDED FROM TESTIFYING AT THE TRIAL OF THIS ACTION
            AS A MATTER OF LAW....................................................................... 29

            1.     DR. SHUMSKY.................................................................... 29

       2.      DR. GREENWALD.................................................................... 38

       3.      DR. MCCOY........................................................................... 39

II.    SECOND MOTION TO PRECLUDE OPINIONS BY DR.
       McCOY and MR. KENNETT BASED ON FACTS NOT IN EVIDENCE.................... 42

       A.     PLAINTIFF'S LOST EARNINGS VALUATION
              CLAIM SHOULD BE DISMISSED......................................... 44

III.   THIRD MOTION IN LIMINE TO PRECLUDE
       OPINION TESTIMONY FROM MARY FROST.......................................... 49

IV.   FOURTH MOTION IN LIMINE:
       PLAINTIFF'S CLAIM THAT THE DEFENDANT'S
       SHELVING SYSTEM WAS DEFECTIVELY
       DESIGNED IN THAT IT REQUIRED
       A LIP IN ADDITION TO A RESTRAINING BAR
       IS INADMISSIBLE ABSENT EXPERT TESTIMONY................................. 51

V.    FIFTH MOTION IN LIMINE:  PLAINTIFF MUST BE
       PRECLUDED FROM INTRODUCING EVIDENCE
       RELATED TO PRIOR INCIDENTS IN MINNESOTA
       AND TEXAS WAL-MART STORES....................................................... 52

CONCLUSION............................................................................................ 53

## TABLE OF AUTHORITIES

**Cases**

Allen v. Uh, 82 A.D.3d 1025 (2d Dept 2011)..................................................... 43

Ascher v. Target Corp., 522 F. Supp 2d 452 (EDNY, 2007)............................... 52

Awards.com v. Kinko's, supra, 42 AD3d 178, 834 NYS2d 147, (1st Dept. 2007)...................... 46

Blazynski v. A Garelick & Sons, Inc., 48 AD 3d 1168 (4th Dept, 2008)................................... 52

Brittingham v. Smith, 2014 N.Y. Misc. LEXIS 439, 2014 N.Y. Slip Op 3028(U) (Suffolk County 2014) ................. 43

Carter v Full Serv., Inc., 29 AD3d 342, 815 NYS2d 41 [2006] .................................................. 29

Celebrity Cruises Inc., v. ESSEF CORP., 434 F. Supp. 2d 169; 2006 U.S. Dist. LEXIS 36319 (SDNY, 2006)............................................. 46, 47

Cirillo v. Depeel, 2011 N.Y. Misc. LEXIS 1245 (March 10, 2011)............................................ 29

Cornell v. 360 West 51st Street Realty, LLC., 2014 WL 1237483 (2014) ................................. 35

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)........................................ 22

Davis v City of New York, 264 AD2d 379, 379-80, 693 N.Y.S.2d 230 (2d Dept 1999)............ 45

Della Hough-Scomav v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 7046 (WDNY, 1999).. 41

Derienzo v. Metropolitan Transportation Authority 694 F. Supp. 2d 229; (SDNY, 2010).... 32, 34

Diaz v. New York Downtown Hospital, 99 N.Y.2d 542, 544 (2002) ........................................ 27

Donadio v. Doukhnych, 55 AD 3d 552, 867 NYS 2d 92 (2d Dept 2009)................................. 26

Easley v City of New York, 189 AD2d 599, 601, 592 N.Y.S.2d 690 (1st Dept 1993)................ 45

Easley v. The City of New York, 189 AD 2d 599, 592 NYS 2d 690 (1st Dept, 1993)................. 31

Euvino v. Rauchbauer, 71 AD3d 820, 897 NYS 2d 196 (2d Dept, 2010)................................. 31

Faulkner v.- Arista Records LLC, 2014 U.S. Dist. LEXIS 129711(SDNY, 2014)..................... 47

Flores v Leslie, 27 AD3d 220, 810 NYS2d 464 [2006] ......................................................... 29

Glaser v County of Orange, 54 AD3d 997, 998, 864 N.Y.S.2d 557 (2d Dept 2008) ................ 45

Guild v. Gen. Motors Corp., 53 F. Supp. 2d 363, 367 [W.D.N.Y. 1999]................................. 52

Guzman v. 4030 Bronx Blvd Associates, LLC, 54 AD3d 42, 861 NYS2d 298 (1st Dept 2008) 29, 31

Harris v. City of New York 2 AD 3d 782, 770 NYS 2d 380 (2d Dept, 2003) ...................... 45, 46

Hornbrook v. Peak Resorts, 194 Misc.2d 273, 754 N.Y.S.2d 132 (Tomkins County 2002) ....... 43

Hyatt v. Metro-North Commuter Railroad, 16 A.D.3d 218, 792 N.Y.S.2d 391; (1st Dept, 2005) ................................................................. 42, 44

In Re: Fosamax Products Liability Litigation, 924 F. Supp. 2d 477 (SDNY, 2013).............. 23, 32

Ingram v. Costco, 117 AD 3d 685 (2d Dept, 2014)............................................................. 51

Israel v. Springs Industries, Inc. 2006 U.S. Dist. LEXIS 80863 (EDNY, 2006)............. 24, 38, 40

Jacques v. Jiminez, 15 Misc 3d 1136A, 851 NYS 2d 820 (Queens County, 2007) ................... 26

Jansen v. C. Raimondo & Son Construction Corp., 293 A.D.2d 574; 741 N.Y.S.2d 71.............. 44

Karwacki Astoria Med. Anesthesia Assoc., P.C., 23 AD3d 438, 439, 808 N.Y.S.2d 123 (2d Dept 2005) .................................................................. 45

Lane v. Smith, 84 A.D.3d 746, 922 N.Y.S.2d 214 (2d Dept 2011)......................................... 45

Lawrence v. Pelkay 27 Misc 3d 1215A (Columbia County, 2010).......................................... 26

Legendre v. Boa, 29 AD 3d 645, 816 NYS 2d 645 (2d Dept 2006)......................................... 26

Levenson v. Home Depot U.S.A., Inc., 2014 U.S. Dist. Lexis 1005 (NDNY 2014) ................... 51

Lidle v. Cirrus Design Corp., 505 Fed Appx. 72, 74 (2d Cir 2012) .............................................. 52
**Lodato v Greyhawk N. Am., LLC, 39 AD3d 494, 495-96, 834 N.Y.S.2d 239 (2d Dept 2007)**
..................................................................................................................................... 45
Mayzel v. Mortetti, 105 A.d.3d 816, 962 N.Y.S.2d 656............................................................... 44
McKelvey v. NYCTA, 2009 NY Slip Op 52776U, 28 Misc 3rd 1218 A (Bronx County 2009) . 27
Miah v. Private One 23 Misc 3d 1133 A, 898 NYS 2d 883, (Kings County, 2009) ................... 46
O'Connor v. Port Authority of New York and New Jersey, 2011 NY Misc Lexis 1159 (New
    York County 2011) ............................................................................................................... 29
Ovalles v. Herrera, 89 AD 3d 636 (1st Dept, 2011) ..................................................................... 31
Parker v. Mobil Oil Corp., 7 N.Y.3d 434 (2006)......................................................................... 35
Placakis v. City of New York, 289 A.D.2d 551, 736 N.Y.S.2d 379; (2001)................................ 44
Ramos v. Howard Industries, Inc., 10 N.Y.3d 218, 224 (2008) ................................................... 27
Ramsey v. Barnabas Hospital, 517 AD 2d 521, 393 NYS 2d 567 (1st Dept 1977) ............... 26, 27
Razzaque v Krakow Taxi, Inc., 238 AD2d 161, 162, 656 N.Y.S.2d 208 (1st Dept 1997)........... 45
Riehl v. Town of Amherst, 308 N.Y. 212 (1954)........................................................................... 26
Roman v. Bronx-Lebanon Hospital Center, 51 A.D.2d 529, 379 N.Y.2d 81 ............................... 44
Romano v. Stanley, 90 N.Y.2d 444, 451-52 (1997) ..................................................................... 27
Romano v. Stanley, 90 NY2d 444, 684 NE2d 19, 661 NYS 2d 589 (1997) ................................ 26
Ruggiero v. Waldbaums Supermarkets, 242 AD 2d 268 (2d Dept, 1997) ................................... 51
Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 251 (2d Cir. 2005) .......................................... 32
Schiller v New York City Tr. Auth., 300 AD2d 296, 296-97, 750 N.Y.S.2d 774 (2d Dept 2002)
..................................................................................................................................... 45
Schmelzer v. Hilton Hotels Corp., No. 05 Civ. 10307, 2007 U.S. Dist. LEXIS 70727, at *5
    [S.D.N.Y., 2007]................................................................................................................... 52
Schonfeld v. Hilliard, 218 F.3d 164, 173 (2d Cir. 2000)............................................................. 47
Sky v. Tabs, 57 AD3d 235, 868 NYS2d 648 [2008] .................................................................... 29
Sky v. Tabs, 57 AD 3d 235, 868 NYS 2d 648 (1st Dept 2008) .................................................... 26
St. Lawrence Factory Stores v. Ogdensburg Bridge and Port Minority; 26 AD3d 700; 810
    NYS2d 532; (3d Dept. 2006)................................................................................................ 46
Szynalo v Barretti Carting Corp., 304 AD2d 558, 559, 756 N.Y.S.2d 904 (2d Dept 2003) ........ 45
Wisniewski v. Jen Novelty Corp., 22 AD 2d 10, 253 NYS 2d 418 (1st Dept 1964) ............. 26, 27
Zink v. Mark Goodson Productions, Inc., et al., 261 AD2d 105, 689 NYS2d 87 ....................... 46

## Rules

Fed. R. Evid. 701 .......................................................................................................................... 50

This is an action to recover for personal injuries allegedly suffered by the plaintiff on April 19, 2011. Plaintiff claims that she was struck in the head by one or more boxed bookshelves from a display shelf in the defendant's Middletown store on April 10, 2009. The display shelf, as demonstrated in photographs marked during depositions, was located below the height of plaintiff's head, and Plaintiff cannot explain how she was struck in the head.

## I.    FIRST MOTION IN LIMINE TO PRECLUDE EXPERT TESTIMONY ON PLAINTIFF'S DAMAGES CLAIMS

This motion in limine seeks to preclude the introduction, and/or to substantially limit, the testimony sought to be offered by Plaintiff from her proposed damages experts. For the reasons set forth in detail herein and in the exhibits annexed hereto, the proposed medical testimony of these experts is legally speculative for failing to address significant evidence of certain pre-existing and alternate conditions of Plaintiff Jennie Carlucci, specifically including cerebral cortical atrophy that was already present on the date of the accident, combined with a history of depression, headaches and sleep disorder. These pre-existing conditions also include her pre-existing shoulder and neck complaints that were diagnosed by numerous doctors who treated Plaintiff prior to the accident. These conditions are not explained away by any of her doctors, are not causally related to the occurrence, and the Plaintiff's experts', specifically Drs. Shumsky and Greenwald, failure to address these conditions in their disclosures renders their testimony inadmissible as a matter of law.

Further, the proposed testimony of Dr. McCoy (a vocational report qualified by his Ph.D) and Mr. Kennett on the issue of Plaintiff's economic loss both lacks evidentiary foundation and are speculative as a matter of law. There is no evidence linking Plaintiff's purported poor work performance after 2009, assuming that her work performance declined, to the accident at issue rather than Plaintiff's ongoing and pre-existing conditions getting worse. Further, and in fact,

Plaintiff is in a better financial condition after the accident than she was before the accident, as her business has flourished.

The following experts are likely to be testifying on behalf of the parties with regards to the damages portion of the trial:

## A.    PLAINTIFF'S EXPERTS

Mrs. Carlucci primarily alleges that she sustained a traumatic brain injury arising from her accident. Dr. Shumsky will testify that Ms. Carlucci currently presents with mild, relative low average cognitive deficits involving reading, remote recall, visual attention/scanning and tracking, visual-motor integration for abstract information, visual quantitative and analogical reasoning, mental calculations, grapho-motor efficiency and visual memory. Ms. Carlucci also presents with more impaired, extremely low to borderline range cognitive deficits involving visual attention, concentration, visual neglect, and visual abstract reasoning. Ms. Carlucci also is alleged to have made a high number of perseverative errors during testimony. Dr. Shumsky will further opine that the plaintiff is moderately disabled and that her likelihood for a significant recovery is extremely guarded. His diagnosis is dementia due to head trauma, adjustment disorder with mixed anxiety and depressed mood and post traumatic stress disorder. He recommends she undergo individual psychotherapy; psychiatric consultation, cognitive remediation therapy, medical driving assessment, reduction of work hours and re-evaluations every 12-24 months.

Dr. Greenwald did not examine or treat Plaintiff contemporaneous to the accident and he relies completely upon the analysis of Dr. Shumsky. Dr. Greenwald will testify that the plaintiff suffered a traumatic brain injury as a result of the incident at Wal-Mart and that her cognitive deficits as identified by Dr. Shumsky are permanent in nature. This motion will not address the

3

cumulative nature of the testimony of Dr. Greenwald as compared to Dr. Shumsky, but the report offers no non cumulative information, and limitations on the testimony at trial are warranted.

David McCoy, Ph.D. will testify regarding plaintiff's proposed Life Care Plan and the cost for said services. David Kennett, Ph.D. will testify regarding plaintiff's economic loss. Specifically, he notes losses in wage and FICA in the amount of $1,375,000; increased labor costs to help manage her business in the amount of $908,040.00; life care (as noted by David McCoy) in the amount of $350,076.00; assisted living in the amount of $544,377.00 and loss of work in the home in the amount of $110,154.00 for a total of $3,287,647.00.

## B.    DEFENDANT'S EXPERTS

Dr. William Barr, a board certified neuropsychologist, will testify on behalf of Wal-Mart. Dr. Barr performed neuropsychological tests of the plaintiff over the course of a nearly five hour interview. Dr. Barr concluded that the plaintiff's reported symptoms can be explained by any one of a number of medical and/or psychological factors independent of traumatic brain injury. According to the results of his interview and the tests he performed, the symptoms the plaintiff is reporting after the accident in question are very unlikely to be caused by a direct physiological effect of any brain trauma. Dr. Barr further opined that there is no conclusive evidence of any residual cognitive dysfunction or other related symptoms that would be causally related to the reported accident occurring at Wal-Mart on April 10, 2009.

Dr. Sheldon Manspeizer, orthopedic surgeon, will testify on behalf of Wal-Mart. Dr. Manspezier will opine that plaintiff's alleged orthopedic injuries, if any, are all resolved and that his examination was generally negative for orthopedic injuries.

Dr. Ronald Silverman, a neurologist, will also testify on behalf of Wal-Mart. Dr. Silverman will opine that the plaintiff is now 4 years post accident and that his examination was

normal. He further noted that her prior testing and evaluations by her treating physicians were also within normal ranges. Dr. Silverman found no objective evidence of headaches, vertigo, frontal lobe executive dysfunction or trouble with language.

Dr. Charles Kincaid (Ph.D.), a licensed rehabilitation counselor will also testify on behalf of Wal-Mart. Dr. Kincaid will opine that the plaintiff is capable of performing her job as owner/President of Carlucci Homes (assisted living facility) and accordingly her loss of income claim or earning capacity is without merit and/or not substantiated by business and personal tax records.

## C.    PLAINTIFF'S DEPOSITION TESTIMONY

The Plaintiff, Jennie Carlucci, testified at deposition, a copy of which is annexed hereto as **Exhibit "A"**. Other than acknowledging a rollercoaster accident, essentially denied almost all of the medical care and treatment that her primary care doctor, Dr. Rohmer, had provided her with regards to her neck and head. She denied a recollection of prior headaches, prior neck complications, and most of the prior care and treatments that Dr. Rohmer provided to her with regards to conditions that could be related to her accident of Wal-Mart. She basically claimed she did not remember anything relevant including dizziness. She was less than candid, with regards to the fact that Dr. Ma had diagnosed her as having reactive headaches to medication and not a traumatic brain injury, and she described her complaints of obstructive sleep apnea as mild.

Mrs. Carlucci was unable to testify with regards to a lot of her lost wage claim. She admits that the Carlucci Home is growing, that her income is significantly up from 2009, and that the Carlucci Home overall has had its income significantly increased since 2009. While she has made a claim that she has been forced to hire 2 ½ additional employees to do the work that she was performing, most of the people doing the work that she used to perform, to the extent that

she is not presently performing it, are family members. Her brother does the finances, her son has an expanded role as the Assistant Director, and her daughter has been helping her as a bookkeeper and doing the marketing. From time to time, her sister helps as well. Her son is a full time salaried employee, who has received substantial increases in pay, her daughter is receiving a salary, and her sister is refusing to accept any money to work. Her brother is paid as the accountant, although he also has a full time job. She claims that she is less capable of performing her duties, and that they take significantly longer for her to perform them. Her biggest problem appears to be her ability to operate the financial software, and to make cogent financial entries in the computer program.

Plaintiff first presented at Orange Urgent Care, a part of the Orange County Regional Medical Center similar to an Emergency Room. Plaintiff was not clear on this, and the records are equivocal, as there would appear to be records from Orange Urgent Care and x-rays showing Plaintiff on the date of loss with cervical disc narrowing and osteophyte formation from Orange Regional Medical Center. Plaintiff also admits, as set forth on the records for the date of accident, that she was on Welbutrin (anti-depressant) on the date of her accident. One must further question whether or not Plaintiff suffered a syncopal type episode, (she has fallen before), and possibly banged her head into the box she was holding or the shelf itself.

Plaintiff also admitted that she submitted an affidavit in a dental malpractice claim regarding the prior claim of Central Serous Retinopathy. Plaintiff was unaware, despite the fact that she is a nurse, that CSR is often found in conjunction with obstructive sleep apnea. Plaintiff has essentially dismissed the findings of Dr. Ma, and closely associated herself with the findings of those doctors who have posited that she suffers from traumatic brain injury.

6

## D.     DR. SHUMSKY, LICENSED PSYCHOLOGIST

### I.     DR. SHUMSKY'S REPORTS

There is a report of Dr. Shumsky dated July 26, 2013 (**Exhibit "B"**). He reviews his initial evaluation, and her history post accident.     He lists as her past history "mitral valve prolapse, mild obstructive sleep apnea  hypothyroid and hypertension". He relates a history of mild to moderate depression and anxiety from 1991-1996. He states that as of 2013, Plaintiff complains of variable sleep issues, headaches, loss of balance and dizziness, loss of concentration and forgetfulness, and memory loss.  she also made numerous emotional complaints such as feelings of depression and mood swings. Dr, Shumsky diagnoses her with Post Traumatic Stress Disorder.

He also conducted a battery of tests.  in evaluating the results, he simply assumed that Ms. Carlucci was average or above average pre-Accident, without explanation. (Report at p.13). He also blindly relied on the findings of Dr. McCoy as to Ms. Carlucci's performance abilities at work. "Ms. Carlucci also reported that she began to experience a number of physical, cognitive and emotional symptoms following her injury". He diagnoses her with dementia due to head trauma.

### II.     DR. SHUMSKY'S DEPOSITION

Dr. Shumsky testified as a licensed psychologist. (**See Exhibit "C"**). At the time of his testimony he was in the process of a practice change where he was transitioning to doing 90% case evaluations and only about 10% treatment, primarily dealing with brain injury. (References are to his transcript, **Exhibit "C"** Tr.at 8-9). He does not have hospital privileges. (Tr. at 8)

According to his history, Ms. Carlucci was shopping at Wal-Mart, she took down a box,

and three more boxes hit her in the head. (Tr. at 16)  In his initial notes, made before he even saw her,  he indicates that she is represented by an attorney who handles traumatic brain injury (and he routinely works with, see e.g. (Tr. at 99), and that she is coming to be seen by him for traumatic brain injury. (Tr. at 17)  His first exam was July 16, 2009, during which he considered her to be a reliable historian despite the fact that she had an alleged brain injury  (Tr. at 21)  On that first visit, amongst other things,. he completed a Philadelphia Head Injury Questionnaire. (Tr. at 23)  During that test, he noted Ms. Carlucci's alleged memory issues (Tr. at 24-25), but that she was not having nightmares or flashbacks (contrary to Ms. Carlucci's sworn testimony). (Tr. at 26-7)  She denied (again contrary to the known facts), ever having migraine headaches, both before and after the accident. (Tr. at 28)  He was asked about whether he recalled reading her primary care doctor's records about her migraine headache history, and he could not recall that, or explain the clear discrepancy being provided by the patient. (Tr. at 28-9)  Despite this, his initial report notes she had a history of migraines. (R. at 68)  The truth is that most of the medical records of Ms. Carlucci were not even received by him before his initial report. (Tr. at 101-102)  His review of all the records was cursory at best. (Tr. ay 106-108)

A similar question pattern developed about the fact that although Ms. Carlucci had prior extensive neck treatment, she claimed her neck only began to cause her problems post accident. (Tr. at 30-32)  Dr. Shumsky did admit that to determine the effects of an accident, it is important to know the patient's pre injury condition. (Tr. at 32-33)  But when he gets an inaccurate history from the patient, he blames it upon the TBI condition, he was pre-determined to find. (Tr. at 33)  Ultimately, Dr. Shumsky admitted that it is important to review records because a person with a brain injury is not necessarily "a hundred percent reliable". (Tr. at 34)  He was further unaware that she was taking valium because she could not sleep due to her neck complaints. (Tr. at 52)

8

he had over 1500 pages of records (Tr. at 28), but could not swear as to what he reviewed or as to knowing the contents of the medical records well (Tr. at 53)  While he claims asking her about her sleep patterns pre-accident was important, he does not recall her responses.  (Tr. at 53)  Yet when pressed, and directly contrary to the known reported medical facts, Ms. Carlucci blamed her history of sleeping problems on the accident and claimed excellent sleep patterns prior thereto.  (Tr. at 54)

Ms. Carlucci had a history of falls, but Dr. Shumsky did not explore that.  (R. at 59-60), and although he believed he was going to be testifying in a significant case, he had little knowledge of the pre-accident records.  (see above, and Tr. at 60)  While fatigue played a big factor in his diagnosis, Dr. Shumsky was unaware that Ms. Carlucci had tried a number of non medical remedies to combat fatigue she was experiencing pre-accident.  (Tr at 69-70)

In her history section, Ms. Carlucci did not relate her longstanding boyfriend relationship. (Tr. at 35)  He reviewed a portion of her college records.  Yet although he later notes that during his testing, Ms. Carlucci had difficulty with the math sections, she withdrew from a remedial math class in college but he never asked the Patient why.  (Tr. at 39)  And he did not make the inquiry despite the fact that he was forced to admit that her pre-accident math skills would be important to know before determining whether post accident math difficulties were causally related to an injury from the accident.  (Tr. at 40-41)  He also did not ask why she obtained a "D" in Elementary Chemistry and Physics, or try to correlate these facts to his ultimate findings.  (Tr. at 42-43)  He did not review all of her academic records, was wrong about correlating when she was a full time student and when she was part time, and he did not review her standardized test results.  (Tr. at 79-82)

While a substantial part of his report deals with Ms. Carlucci's ability to operate her

business post accident, he did not seek detail of her business pre-accident. (Tr. at 46)  As to her post accident ability to operate her business, he focused on Plaintiff's claim that people were being hired to do "her work", without independently investigating her claims. (Tr. at 48)  He claimed, relying on Ms. Carlucci, that she successfully operated her business working less than 40 hours per week, but after her accident she worked longer hours, accomplished less, and needed three people to do her work. (Tr. at 50)  He claims she was high functioning before the accident, but he had no school or business records from 2000 until the accident, he did not interview her son or daughter, or anyone at the facility, before issuing his first report. ( Tr. at 84)  He also did not review the emergency room record. (Tr. at 86)  He had no information about the fact that Ms. Carlucci's initial MRI showed no evidence of injury and her initial CT scan showed degenerative changes. (Tr. at 89-90)

She told him that at the time of her accident three to four boxes fell on her, she became dazed, and did not know what happened to her. (Tr. at 36)  She clearly left him with the impression that she did not recall being struck in the head, but yet she claimed having flashbacks to it, a finding he admitted was inconsistent. (Tr. at 76-77)  Dr. Shumsky did admit that a majority of people experience memory decline as they age. (Tr. at 72)  Isolated loss of memory events are not indicative of injury, without evidence of frequency and severity. (Tr. at 73)

With regard to his second report, Dr. Shumsky could not explain why the Plaintiff had a change in libido (Tr. at 110), and admitted that Plaintiff's alleged commencement of unusual dreams did not fit the pattern of being caused by the accident. (Tr. at 111)  The Plaintiff still did not tell him about her bouts of depression, which he admits he would have wanted to know about. (Tr. at 112)  Ms. Carlucci did not acknowledge her sleep disorder from before the accident (Tr. at 114), He sees no evidence that she needs to be in a nursing home, and she has

maintained most of her skills. (Tr. at 122).

The primary basis for the Doctor's analysis of the plaintiff is based on what the Plaintiff and her family told him , and he cannot explain why many of the other facts seem inconsistent. The facts he obtained from her family are from interviews conducted by the Plaintiff's law firm. He relies on that, and the report of Dr. McCoy referenced herein, to justify his conclusions. (Tr. at 122-125) He cannot and does not make reference to her negative medical testing, does not correlate her previous treatment, and makes no differential diagnosis.

## E.    DR. MCCOY REPORT AND LIFE CARE PLAN

### I.    MCCOY REPORT

Dr. David McCoy issued an unsigned report dated June 3, 2013, a copy of which is annexed hereto as **Exhibit "D"**. He found Ms. Carlucci to have a diminished capacity to perform household chores, a need for future medical care, and a loss of income sustainability. The report is full of conjecture and opinion, and short on facts. He does not refer to a baseline. He repeats most of the complaints Ms. Carlucci has made herein. He claims she is in jeopardy of losing the business, although by all accounts is financially growing.   Samples of the findings, and their lack of probative value, are as follows:

> -    He claims "based upon my assessment"... that she is unable to perform all of her previous household duties" He writes that she used to spend 6 hours on these tasks, which is less than the national average of 12.6 hours. He places an hourly rate on this and creates a loss of household income. Yet, to date, Ms. Carlucci continues to so her own thing and has expended no money therefore. he continues this into the future.

> -    He creates a life care plan that is based on his findings, not that of any doctor.   He includes, for example, Osteopathic Manipulation initially for $2800., then $700. per annum, although no doctor prescribes this, and although Ms. Carlucci treated for these conditions pre-accident, and although she currently does not

11

receive this treatment

-       He includes neuropsychologist costs even though Ms. Carlucci has told him she is not going because she is too busy.

-       He includes all of her medications, even though she was on many of them pre-accident.

_       He includes $10,000. for further neuropsychological testing, when he admits Ms. Carlucci did not complete the last testing session;

-       He includes physical and occupational therapy that Plaintiff has never gone for, and a $90,000. Comprehensive TBI rehab that she also has not attended. This claim basically for free lifetime care for Ms. Carlucci, who currently lives alone and cares for herself.

-       Outrageously, he provides for assisted living at age 76, for $240,000.00, when there is absolutely no evidence that Ms, Carlucci's mental status is deteriorating in any manner so as to justify a causally related expense.

-       He provides for household assistance from 2009-2013 even though none was expended, and then continues such loss into the future.

-       He makes no comparison to the costs actually expended from 2011 - 2013. However, based on the foregoing, not less than $345,000. of his $366,000.00 life care plan should be excluded.

## II.    MCCOY DEPOSITION

He has a doctorate in Business Administration, and is an RN. (Tr. at 5-6) He presently

works for insurance companies setting up care plans for their insureds. (Tr. at 12-16). He also

creates life care plans for Plaintiffs. due to his failure to accurately issues his costs. (Tr. at 16) )

He tried to open his own facility in New York but that failed. (Tr. 11-12) He has worked with

Finkelstein and Partners more than ten times since 2009.   (Tr. at 18)  Before having direct

communication with Ms. Carlucci he only reviewed the emergency room record. (Tr. at 19) He

read Dr. Shumsky's reports but never spoke to him. (tr. at 25-26) While he does not know how

testing such as for visual memory is done, he knows you need a baseline to test it. (Tr. at 26) He did not see pre accident records, and he just assumed her pre accident condition was normal. (Tr. at 27) He determined how the business ran pre-accident from what Plaintiff told him. Tr. at 27) He did not examine the books of the facility, and he did not go back and look at the business in 2009. (tr. at 28) He observed her trying to run the facility and making mistakes. (Tr. at 29 )He does not recall the number of patients or other details about her business pre-accident (Tr. at 29) He spent a total of four hours with her, including a short period of time with her son. (Tr. at 30) According to him, the son was an RN who worked at the facility before and after the accident, but he took on a lot more responsibility after the accident. (Tr. at 31)

As he recalled it, the Emergency room record did not disclose a concussion, and all of the tests were negative, though he claimed (we don't have the technology to see the things that minute. (Tr. at 35) He noted Ms. Carlucci drove herself to the hospital, and then home. (Tr. at 37) His job is to determine level of functioning and to let the doctors tell him what's wrong. (Tr. at 38) He based his entire evaluation on what he observed spending a half day with her in 2012. (Tr. at 40-41) According to Dr. McCoy, Ms. Carlucci did not take the time off from work to complete her neuro psychological testing. (Tr. at 43). According to Dr. McCoy, Ms. Carlucci is unable to perform her work, she makes mistakes and completely drops the ball, but she is the driving force behind the business. (Tr. at 46-47) According to him, if she was this way before the accident the State would have closed her down. (Tr. at 48).

The complete lack of scientific basis of Dr. McCoy's analysis can be seen in his claim that Plaintiff is in jeopardy of losing the Carlucci home business. First, he gives a financial explanation, but when reminded that the business is prospering, he claims she is in jeopardy of losing the business because she is burning her son out. (Tr. at 49) He claims this despite the

13

business, Ms. Carlucci and her son are making significantly more money. (Tr. at 50) She claims to be working 70 hours now instead of 35, 6 days per weak 12 hours per day. (Tr. at 52) Although Plaintiff identified new hires, he did not compare the business volume pre accident or post accident nor explain why they were hired more than two years post accident. (Tr. at 52) He did not even examine their business model, because according to him, he knows the business. (Tr. at 54)

At the time of his visit, the Plaintiff was on no medications for her traumatic brain injury. (tr. at 55) She was on anti-anxiety medication which would have helped her sleep. (Tr. at 55-56) He claimed her neck and shoulder prevented Plaintiff from completing her full household chores. (Tr. at 58) She had not hired anyone to assist her, but the claim was that she would forget her grocery list, come home without things she needed, etc. (Tr. at 59) She denies needing help, but that's just the Plaintiff in denial. (Tr. at 59) When he wrote in his report that she operates the business with decreasing success, he was nit referring to the decreasing success of the business. He provided for additional household help because it takes her longer to get groceries, clean and remove snow. (Tr. at 62) Of course, he didn't go to her house (Tr. at 63), and if Plaintiff is working 35 more hours per week, he doesn't account for this.

The life care plan is broken down into recurring and non-recurring costs. He address things like osteopathic care and other care she is not currently receiving (Tr. at 65.) He notes she has health insurance but he does not account for it. (Tr. at 66) He allocates for neuropsychological testing, even though he admits the Plaintiff was not taking the time to go see him. (tr. at 68) He admits he includes things no doctor has recommended. (Tr. at 73). For example, he diagnoses a 90,000.00 rehab program that she has never done. (Tr. at 76). He even includes cost he know she didn't incur for household help. (Tr. at 78-9).

14

F.    **DR. BRIAN GREENWALD**

The Plaintiff has been periodically examined by Dr. Brian Greenwald, a Physical and Medical Rehabilitation Specialist. His narrative report of August 11, 2013 is annexed hereto as Exhibit "M". Dr. Greenwald states that he was provided with substantial medical records of the Plaintiff which he reviewed and which he used , along with his examinations, to reach his diagnosis. Important points raised in his report are as follows:

- He reviewed Dr. Rohmer's records from 1992. He notes that Plaintiff was diagnosed with Central Serous Retinopathy. Despite evidence of a prior whiplash injury (which can cause a mild TBI), substantial complaints of re-injury to the neck, and histories of depression, sleep disorder, and migraines, he states the records are routine and non-revealing. This is important for two reasons. First, **he cannot testify that the accident at Wal Mart aggravated a pre-existing condition, because he finds none**. Second, he does not include the pre-existing findings of whiplash injury, depression, sleep disorder, and migraines in a differential diagnosis.

- Acknowledges CT scan of 4/10/09 shows degenerative brain atrophy.

- He reviews the medical report of Dr. Samuel Kozner, a neurologist, whose report is annexed hereto as Exhibit "N" He claims the assessment was "memory loss and confusion" This is complete glossing over of the report, and evidences a complete bias of the report. Dr. Kozner wrote that her neck was supple, motor strength 5/5, coordination was normal on finger to nose, and her gait was narrowly based and within normal limits. He gave her a Folstein Mini mental Status exam, and she scored 29 out of 30. He concludes "56-year-old with complaints of confusion, inability to perform as well as she used at work, though **she does operate at a very level** with non focal neurologic exam and minor findings on her neuropsychological profile." He concludes "**I do not think any further work up is recommended.**" In fact, **his follow up report makes clear he does not believe her confusion or her fatigue are related to her concussion.**

- He acknowledges that both Dr. Faskowitz and Dr. Ma identified a potential cause of her headaches to be related to the Plaintiff's long standing analgesic drug history, but does not do a differential diagnosis including this.

- He notes MRA of the head of 5/02/12 (used to find tearing or blood flow irregularities consistent with (TBI) to be negative.

He diagnoses the Plaintiff as having a mild TBI based on her being dazed and confused after the accident (effectively, a concussion). He then causally relates all subsequent sequellae without doing any differential diagnosis. He does not order any further brain studies, even though longstanding mTBI would likely show its effects on specialized MRI within 1 year after occurrence.

## G.    REPORT OF ECONOMIC LOSS BY DR. KENNETT

An economic loss report was prepared by David Kennett, Ph.D., (**Exhibit "F"**) an economist at Vassar College. He worked with a limited set of financial records. For example, he did not look at Plaintiff's tax returns after 2009, nor the operating statements of Carlucci Homes. (Report at 3-4) He also spoke to her brother/accountant in detail. He relies on Dr. McCoy, who is not a medical doctor, for both Plaintiff's economic medical costs and her medical condition. (R. at 4)

According to the report, due to Ms. Carlucci's marketing efforts, there was substantial growth in 2008/9 and 2009/2010. Ms. Carlucci's accident was in April 2009. Thus, 3/4 of 2009 and 2010 is post accident. In looking at the numbers, only in 2008, the year before the accident, did Carlucci Homes not show at least some growth. After the accident, in 2010 it showed the largest growth. (R. at table 1, p.3) Thus, the claim that the growth slowed after her accident is outright false. Although Mr. Kennett claims that the actual affect of her injury "is hard to predict", he claims he calculated incremental labor costs which constitute a loss to the Plaintiff.

(R. at 5). Yet, the numbers show that the entire analysis Plaintiff relies upon is faulty. For example, taken directly from Table 1 on page 5 of Mr. Kennett's report, we can document:

> **In the two years before her accident Carlucci homes grew revenue by less than 10 percent. However, each year after the accident, revenue grew by not less than 20%, with the largest growth during calendar year 2010 which was the year that began 9 months after her accident. During this period, according to Table 2 (page 6 of the report), only a single employee was added.**
>
> **During the 2009-2011 period, revenue grew 87.7%, while labor costs only grew 52.1%.**
>
> **During the same 2009-2011 period, Ms. Carlucci's income rose 79%, almost matching revenue growth. Her son's revenue also grew substantially.**

Unexplained is why certain employees that were hired were not hired until 2012, or how the business was able to grow without these employees after her accident but before they were hired. (R. at 6) He claims that the cost of the hiring of additional employees is a direct loss to Plaintiff (R. at 7), without any analysis of what work they were doing, even though the hiring of these employees may also be driving revenue. There is no analysis as to whether there were additional patients at the facility, though Ms. Carlucci admitted there was. There is no analysis as to whether additional services were being provided at the facility. There is no explanation as to why so many people are needed to make up the difference of work being done by someone who was now at the facility twice as much as before. What is clear is that both of Ms. Carlucci's kids claim to be doing all of her work, each is drawing a substantial amount of money from the business, and yet Ms. Carlucci makes more and more money each year while claiming she is losing income.

**H.    PLAINTIFF'S PRIOR TREATMENT, HER CT SCAN, AND DR. MA**

As discussed herein, Plaintiff's medical history contains many relevant findings which must be considered before she can be diagnosed with a traumatic brain injury from her alleged accident at Wal-Mart.   Annexed hereto as **Exhibit "G"** are excerpts from the records of Plaintiff's primary care physician is Daniel Rohmer, MD.  His records reveal the following:

-<u>Neck</u>: A neck injury on a roller coaster is noted in her medical history in which she sustained whiplash in 1974 or 1975. Plaintiff was in the hospital for a week or two following the roller coaster incident. Plaintiff underwent physical therapy on her neck in 1986 and 1987.  A medical report from Horton Hospital, dated June 25, 1987, indicates plaintiff was seen for neck stiffness. A trigger point injection was given. In January (valium & physical therapy helped) and August 1992 flexeril [muscle relaxer] prescribed, plaintiff complained that her neck "went out". In October 1996, plaintiff complained of pain (flexeril given). In July 1997, plaintiff felt her neck "crunch" after she picked up a fifty pound bag of potatoes (parafon forte [relieves pain and stiffness in muscles] and flexeril given). Plaintiff fell in December 1999 and sprained her neck. In September 2002, plaintiff requested valium to help with her neck pain and sleep. In February 2003, she threw her neck out shoveling snow. Neck pain in March 2003 is also noted.

-<u>Back</u>: complained of pain on October 20, 1993. Valium prescribed.   Pain in January 2001, flexeril prescribed.

-<u>Depression</u>: noted on June 7, 1993 (prozac).

-<u>Sleep</u>: In November 1996, she complained she had not been able to sleep at night for years (ambien given). In August 1999, plaintiff began having hot flashes.

-<u>Brain/Head:</u>  There is a notation regarding the subject accident: On April 13, 2009, plaintiff reported over the telephone that she had a head injury on April 11, 2009.  She went to the ER, CT was negative. She complained of difficulty with memory. In a medical report dated December 2005, plaintiff stated that she had migraine headaches several times a year.

-<u>Shoulders</u>:  In April 2003, plaintiff complained of right shoulder pain following shoveling snow.   A trigger point injection was given and she was referred for physical therapy. On July 18, 2009, plaintiff allegedly fell because of dizziness due to her "brain trauma." She sustained an injury to her left shoulder.

-Vision: As discussed above, plaintiff claimed vision problems and ultimate diagnosis of Central Serous Retinopathy in 2002.

Plaintiff was seen on April 10, 2009 for a CT scan of the brain without contrast at Orange Regional Medical Center Horton Hospital while in the Emergency Room (**Exhibit "K"**, which revealed mild Cerebral Cortical Atrophy (The "wasting away of the brain", degenerative, not trauma induced). There was no evidence of intracranial injury. This court can take judicial notice of the fact that symptoms related to Cerebral Cortical Atrophy include dementia, characterized by a progressive impairment of memory and intellectual function that is severe enough to interfere with social and work skills. Memory, orientation, abstraction, ability to learn, visual-spatial perception, and higher executive functions such as planning, organizing and sequencing may also be impaired. yet Dr. Shumsky simply ignore this in his report and testimony.

On May 1, 2012, plaintiff was seen by Kaiyu Ma, M.D, PhD at Crystal Run Healthcare (An excerpt of records is annexed hereto as **Exhibit "L"**) for a consult complaining of headaches and unrefreshment after sleep. Dr. Ma noted with regard to plaintiff's mental status that repetition was intact and immediate, short and long-term memory, attention and naming were intact. (This does not sound like someone with TBI.) Coordination was also intact. Dr. Ma assessed plaintiff with chronic daily headaches and obstructive sleep apnea.

On May 3, 2012, an MRA of the plaintiff's head was performed at Crystal Run Healthcare, which was normal. On May 6, 2012, Dr. Ma conducted a sleep study at The Sleep Center at Crystal Run Healthcare. Following the study, Dr. Ma found plaintiff to have mild obstructive sleep apnea syndrome with oxygen desaturation. Dr. Ma recommended weight loss, avoidance of sedatives, hypnotics, and sleep aids.

## I.    DEFENSE EXPERT, DR. WILLIAM BARR

Dr. William Barr, a Board certified Clinical Psychologist, conducted a 50 minute interview, and 4 hours of testing, of the Plaintiff. His report is annexed as Exhibit "H" with his curriculum vitae. Her history of the event was relatively inaccurate, as she now claimed to have fallen to the ground. (R. at p.1)   Dr. Barr does a detailed recitation of his interview with the Plaintiff. Plaintiff describes herself as extremely disorganized since the accident, that she mixes things up and loses things. She also described a significant increase in her work day. (R. at p.3) Unlike Plaintiff's doctors, Dr. Barr does a complete review of Ms. Carlucci's medical history beginning at page 4 of his report. He documents from her prior medical records her treatment and complaints of neck pain, whiplash, her becoming comatose from an allergic reaction to codeine, chronic headaches, stress from both her divorce and operating the nursing home, and sleep disorders. (R. at pgs. 4-5)

Dr. Barr administered a battery of tests to the Plaintiff. He details her scores and performance in his report. He found similar findings to Dr. Shumsky's testing in 2010, except Plaintiff scored noticeably worse in her "perceptual reasoning". He found no evidence of a general decline in her cognitive or intellectual skills. (R. at 7)

Dr. Barr reached a number of significant conclusions from the testing process:

> - That there was no evidence of performance deficit that would equal functional impairment.

> - That Plaintiff reported anxiety and depression symptoms, with indications of symptom magnification.

> - That given the medical history, " ... the plaintiff is likely to have sustained what would be, at most, the effects of a mild

concussion secondary to the reported accident. Physiological symptoms resulting from that level of injury are known to resolve spontaneously in 7-10 days in the vast majority of individuals. **There is no reliable scientific evidence to indicate that symptoms secondary to a concussion of that type would persist beyond a period of 1-3 months**, which raises a number of questions about this case, where symptoms are described well over four years following the accident in question"

> **- That her physicians attribute her claims to the occurrence without evidence of objective findings, and without "consideration of other medical and psychosocial factors that were present both before and after the reported accident"**

> **- A review of Dr. Shumsky's test results do not support a diagnosis of Dementia due to Head Trauma.** Current testing was in the average range with no evidence of cognitive decline. He found the test results to be more suggestive, as relates to medical conditions, of possible underlying medical conditions such as hypertension, the effect of multiple analgaesics she had been taking, chronic pain and/or depression.

See the report at pages 9-11.

## J.   DEFENSE EXPERT, DR. RONALD SILVERMAN

Dr. Ronald Silverman conducted a neurological examination in which he found no objective evidence of headaches, vertigo, frontal lobe executive dysfunction, or trouble with language. See his report annexed hereto as **Exhibit "I"**.

## K.   DEFENSE EXPERT, CHARLES A. KINCAID

Charles A. Kincaid did a complete Vocational Evaluation of the Plaintiff (see **Exhibit "J"**). As part of that analysis, he did a comprehensive study of the numbers associated with Ms. Carlucci's income, and he came to very opposite conclusions than Mr. Kennett, which evidence, by way of example, by Ms. Carlucci's 73% increase in income from 2009 to 2011. Moreover, Dr. Kincaid admitted (as Mr. Kennett glosses over) but also acknowledged, the lack of data as to case load, services and specialty services being offered by Carlucci Homes, so as to prevent any

21

qualified expert to draw any conclusion that additional staff was needed because of Plaintiff's condition.  He concluded:

> - Ms. Carlucci was capable to continue functioning in her current capacity
>
> - Ms. Carlucci earns an income consistent with her position as President of Carlucci Homes, and is capable of continuing to do so.
>
> - Her work-life expectancy remains intact, as does her wage earning power.

## L.    LEGAL STANDARD UNDER DAUBERT

It is well settled that the principles to be applied to the within motion in limine in Federal Court as to the admissibility of scientific, medical or technical expert testimony are those principles set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Thus, it has been written:

> The presentation of scientific and technical knowledge or opinion testimony by a "witness qualified as an expert" is permitted under *Rule 702 of the Federal Rules of Evidence* where such testimony:
>
> (1) will assist the trier of fact to understand the evidence or to determine a fact in issue
> (2) is based upon sufficient facts or data,
> (3) is the product of reliable principles and methods; and
> (4) results from the reliable application of principles and methods . . . to the facts of the case.
>
> *Fed. R. Evid. 702.* In making a determination about whether to admit proposed expert testimony, the Second Circuit has held that "the district court should consider the indicia of reliability identified in *Rule 702*," specifically items 2-4 listed above. *Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002)* (internal quotation marks omitted). The "reliable principles and methods" prong of *Rule 702* analysis requires the Court to look to other factors in  order to fulfill its designated "gatekeeping" role, such as:

> (1) whether a theory or technique has been or can
> be tested;
> (2) whether the theory or technique has been
> subjected to peer review and publication;
> (3) the technique's known or potential rate of error
> and the existence and maintenance of standards
> controlling the technique's operation; and
> (4) whether a particular technique or theory has
> gained general acceptance in the relevant scientific
> community

*United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)* (citing *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993))*. The purpose of analyzing proposed expert testimony in light of *Rule 702* and Daubert reliability factors is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).*

In Re: Fosamax Products Liability Litigation. 924 F. Supp. 2d 477 (SDNY, 2013).

While the standard set forth in Daubert does not apply to a treating physician's fact or observation testimony, a treating doctor's "opinion on causation is subject to the same standards of scientific reliability that govern the expert opinion of physicians hired solely for the purposes of litigation." In re Fosamax Prods. Liab. Litig., 2009 U.S. Dist. LEXIS 109366, 2009 WL 4042769 (S.D.N.Y., 2009). Thus, in Derienzo v. Metropolitan Transportation Authority 694 F. Supp. 2d 229; (SDNY, 2010), the Court stated:

> The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* "interpreted *Rule 702* to require district courts to act as gatekeepers by ensuring that expert scientific testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *In re Fosamax Prods. Liab. Litig.,* No. 06 Civ. 4110, 688 F. Supp. 2d 259, 2010 U.S. Dist. LEXIS 6931, at *20 (S.D.N.Y. Jan. 27, 2010) (Keenan, J.) (quoting *Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592-93, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).*

**** 

23

> When, such as here, a plaintiff seeks to establish causation through the use of an opinion from a treating physician, the "opinion on causation 'is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation.'" *Flemings v. Merck & Co. (In re Fosamax Prods. Liab. Litig.), No. 06 Civ. 7631, 2009 U.S. Dist. LEXIS 109366, at *18 n. 4 (S.D.N.Y. Nov. 23, 2009)* (Keenan, J.) (quoting *Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000))*. Derienzo, id.

Therefore, the opinion testimony in question herein will be subject to <u>Daubert</u>.

In a decision very much on point (including rejecting a speculative life care plan) , and which makes numerous decisions almost identical to the relief sought herein by Defendant, the court in <u>Israel v. Springs Industries, Inc,</u> 2006 U.S. Dist. LEXIS 80863 (EDNY, 2006) went into great detail as to the analysis necessary to admit expert testimony. The court wrote:

> In *Daubert, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469,* the Supreme Court stated that before [*4] admitting evidence under *Rule 702,* the trial judge is required to ensure that the scientific testimony or evidence is both reliable and relevant. *Id. at 589.* The court must assess whether the expert's opinion is grounded in "methods and procedures of science," whether it consists of more than simply "subjective belief or unsupported speculation" (*id. at 589*), and "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Id. at 592-93.* In making this determination, the court may consider the following (nonexclusive) factors: (1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) general acceptance in the scientific community. *Id. at 591-93.* Other factors courts tend to take into account include: (a) the existence of standards controlling the technique's operation, (b) the relationship of the technique to [*5] methods that have been established to be reliable, (c) the qualifications of the expert witness, and (d) the non-judicial uses to which the method has been put. *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 742 n.8 (3d Cir. 1994); Finley v. NCR Corp., 964 F. Supp. 882, 885 (D.N.J. 1996).* Finally, the court must determine "whether

the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have devolved their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1317 (9th Cir. 1995)*. The proponent of the expert's testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Daubert, 509 U.S. at 593 n.10.*

***

Moreover, in *Kumho Tire v. Carmichael, 526 U.S. 137, 150, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)*, [*7]  the Supreme Court emphasized that courts have "broad latitude" in deciding whether and how to apply the Daubert factors and that "the relevant reliability concerns may focus upon personal knowledge or experience." In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *FED. R. EVID. 702* advisory committee's note (2000). The Court in Kumho Tire also stressed that the Daubert elements are not a definitive checklist and that the trial court's gatekeeping inquiry must be "flexible" and "tied to the facts of a particular case." *Kumho Tire, 526 U.S. at 150.* See also *Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999)* ("the district court's gatekeeper role is a flexible one and . . . the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted."). The primary objective is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes [*8]  the practice of an expert in the relevant field." *Kumho Tire, 526 U.S. at 152.*

Importantly, however, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" *Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005)* (quoting *FED. R. EVID. 702* advisory committee note), cert. denied, *126 S. Ct. 338, 163 L. Ed. 2d 50 (2005)*. In other words, expert opinions are inadmissible if based on speculative assumptions. See *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 37 F.3d 804, 824 (2d Cir. 1994)* (overruled on other grounds by *Zicherman v. Korean Air Lines Co., 516 U.S. 217, 116 S. Ct. 629, 133 L. Ed. 2d 596 (1996)*, as recognized in *Brink's Ltd. v. South African Airways, 93 F.3d 1022,*

25

1029 (2d Cir. 1996)). See also *Kumho Tire, 526 U.S. at 157* ("Opinion evidence that is connected to existing data only by the *ipse* [*9] *dixit* of the expert" should not be admitted.).

In Israel, the court went on to note that it may also examine whether the expert's "theory or technique has been subjected to peer review and publication." Here, Plaintiff does not suggest that either Dr. Shumsky or Dr. McCoy have rendered opinions subjected to peer review. Alternatively, the court may consider whether the expert's theory or technique has been accepted by his peers. There is no showing of this.

## M.    APPLICABLE NEW YORK LAW ON CAUSATION

It is well settled that the failure of a plaintiff's doctor to address the existence of the findings of a prior injury or of a degenerative condition and how they could affect the issue of causation to the accident which is the subject of the action, renders the opinion speculative and inadmissible as a matter of law. Sky v. Tabs, 57 AD 3d 235, 868 NYS 2d 648 (1st Dept 2008); Lawrence v. Pelkay 27 Misc 3d 1215A (Columbia County, 2010); Donadio v. Doukhnych, 55 AD 3d 552, 867 NYS 2d 92 (2d Dept 2009) (failure to address findings of defense radiologist renders opinion speculative). Legendre v. Boa, 29 AD 3d 645, 816 NYS 2d 645 (2d Dept 2006); Jacques v. Jiminez, 15 Misc 3d 1136A, 851 NYS 2d 820 (Queens County, 2007). Wisniewski v. Jen Novelty Corp., 22 AD 2d 10, 253 NYS 2d 418 (1st Dept 1964); Ramsey v. Barnabas Hospital, 517 AD 2d 521, 393 NYS 2d 567 (1st Dept 1977).

When expert testimony is being offered as proof on the issue of causation, it needs to be based on scientific testimony or laboratory data, not simply the expert's conclusions. Romano v. Stanley, 90 NY2d 444, 684 NE2d 19, 661 NYS 2d 589 (1997). In Riehl v. Town of Amherst, 308 N.Y. 212 (1954), the Court of Appeals was faced with a determination as to whether a plaintiff's occupational illness, chronic myocarditis, accelerated a non-employment related

cancer resulting in his death. The Court rejected such testimony, finding that expert opinion lacked probative force because it was speculative. The Court of Appeals in fact noted that the Court should be reluctant to supply a negligence based cause of death where clear, natural causes are in play. <u>Riehl</u>, *supra*, 308 N.Y. at 217-18. In <u>Romano v. Stanley</u>, 90 N.Y.2d 444, 451-52 (1997), the Court of Appeals explained:

> In this case, the proof offered to bridge this evidentiary and logical gap was an expert's affidavit asserting that in view of Stanley's blood alcohol level when she was served at Jack's and Martel's, she necessarily must have exhibited the symptoms of intoxication that are familiar to trained bartenders: gaze nystagmus, glassy eyes, motor impairment and difficulties in controlling her speech and voice levels. **The problem with this proffered proof was not that it was based on laboratory tests, but rather that the expert's ultimate conclusions were both speculative and conclusory. As this Court has previously stated, '[w]here the expert states his conclusion unencumbered by any trace of facts or data, [the] testimony should be given no probative force whatsoever.'**

<u>See</u> also, the Court of Appeals in <u>Diaz v. New York Downtown Hospital</u>, 99 N.Y.2d 542, 544 (2002) "[W]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, however, the opinion should be given no probative force and is insufficient to withstand summary judgment." <u>Ramos v. Howard Industries, Inc.</u>, 10 N.Y.3d 218, 224 (2008) "[A]n expert's affidavit--offered as the only evidence to defeat summary judgment--'must contain sufficient allegations to demonstrate that the conclusions it contains are more than mere speculation and would, if offered alone at trial, support a verdict in the proponent's favor. There can be no question that speculative testimony as to causation is inadmissible. <u>Wisniewski v. Jen Novelty Corp.</u>, 22 AD 2d 10, 253 NYS 2d 418 (1st Dept 1964); <u>Ramsey v. Barnabas Hospital</u>, 517 AD 2d 521, 393 NYS 2d 567 (1st Dept 1977). In <u>McKelvey</u>

27

v. NYCTA, 2009 NY Slip Op 52776U, 28 Misc 3rd 1218 A (Bronx County 2009), Justice

Billings wrote:

> Regarding the cause of plaintiff's claimed injuries, Dr. Hausknecht finds only that "the motor vehicle accident of 7/20/05 is the substantial contributing factor to her lower back condition." Zorowitz Aff., Ex. 1 at 4. He offers no objective medical support for this opinion. *Rose v. Citywide Auto Leasing, Inc.*, 60 AD3d 520, 875 N.Y.S.2d 471 (1st Dep't 2009); *Delfino v. Luzon*, 60 AD3d at 198; *Rodriguez v. Abdallah*, 51 AD3d 590, 591, 858 N.Y.S.2d 169 (1st Dep't 2008); *Gorden v. Tibulcio*, 50 AD3d at 464. He fails even to base this opinion on his review of her medical records, his physical examination findings, the nature of her injuries, or the duration of her symptoms or otherwise explain how he reached his conclusion regarding causation. *Linton v. Nawaz*, 62 AD3d 434, 437-38, 879 N.Y.S.2d 82 (1st Dep't 2009); *Chan v. Garcia*, 24 AD3d 197, 198, 806 N.Y.S.2d 23 (1st Dep't 2005). **In particular, he fails even to mention the possibility of degeneration or to explain why he ruled it out as the cause of plaintiff's lumbar condition.** *Rose v. Citywide Auto Leasing, Inc.*, 60 AD3d 520, 875 N.Y.S.2d 471; *Valentin v. Pomilla*, 59 AD3d 184, 186, 873 N.Y.S.2d 537 (1st Dep't 2009); *Gorden v. Tibulcio*, 50 AD3d at 464.
>
> Dr. Hausknecht's conclusory opinion regarding causation contrasts with the opinions by defendants' physicians in concluding that degeneration before the vehicle collision caused plaintiff's lumbar abnormalities and related limitations. These latter opinions specify their reliance on plaintiff's age, her spondylosis predating the collision, and the absence of a traumatic origin that would provide a neurologic explanation for her persistent symptoms, such as the examples Dr. Berkowitz suggests. *Lopez v. American United Transportation*, 66 A.D.3d 407, 886 N.Y.S.2d 157, 2009 WL 3126503 at *1 (1st Dep't 2009); *Linton v. Nawaz*, 62 AD3d at 441. *See Marsh v. City of New York*, 61 AD3d 552, 877 N.Y.S.2d 65; *Delfino v. Luzon*, 60 AD3d at 198. Dr. Hausknecht's report ignores all these factors. *Lopez v. American United Transportation*, 66 A.D.3d 407, 886 N.Y.S.2d 157, 2009 WL 3126503 at *1; *Linton v. Nawaz*, 62 AD3d at 442; *Valentin v. Pomilla*, 59 AD3d at 186; *Chan v. Garcia*, 24 AD3d at 198.
>
> **Dr. Hausknecht's lack of specificity renders his contrary opinion, that plaintiff's injuries were caused by the vehicle collision, purely speculative.** *Lopez v. American United Transportation*, 66 A.D.3d 407, 886 N.Y.S.2d 157, 2009 WL 3126503 at *1; *Valentin v. Pomilla*, 59 AD3d at 186; [***9]

> *Gorden v. Tibulcio, 50 AD3d at 464*; *Saint-Hilaire v. PV Holding Corp., 56 AD3d 541, 867 N.Y.S.2d 494. See Sky v. Tabs, 57 AD3d 235, 238, 868 N.Y.S.2d 648 (1st Dep't 2008)*. **Without providing a reliable basis for linking her lumbar condition to the July 2005 collision, Dr. Hausknecht fails to rebut the findings by defendants' physicians regarding the cause of that condition.** *Rose v. Citywide Auto Leasing, Inc., 60 AD3d 520, 875 N.Y.S.2d 471*; *Rodriguez v. Abdallah, 51 AD3d at 591.* [Emphasis added].

See <u>Cirillo v. Depeel</u>, 2011 N.Y. Misc. LEXIS 1245 (March 10, 2011) (Once a defendant presents evidence of a pre-existing injury, it is incumbent upon the plaintiff to present proof to address the defendant's lack of causation citing <u>Sky v Tabs</u>, 57 AD3d 235, 868 NYS2d 648 [2008]; <u>Carter v Full Serv., Inc.</u>, 29 AD3d 342, 815 NYS2d 41 [2006]; Flores v Leslie, 27 AD3d 220, 810 NYS2d 464 [2006])). See <u>also</u> <u>O'Connor v. Port Authority of New York and New Jersey</u>, 2011 NY Misc Lexis 1159 (New York County 2011) (plaintiff's experts precluded from testifying at trial).

## N.    DR. SHUMSKY, DR, GREENWALD AND DR. McCOY MUST BE PRECLUDED FROM TESTIFYING AT THE TRIAL OF THIS ACTION AS A MATTER OF LAW.

### 1.    DR. SHUMSKY

There are two grounds to preclude the testimony of Dr. Shumsky. First, his testimony is speculative, as he fails to explain how the Plaintiff's complaints pre-accident have not simple continued to become worse, nor explain other possible alternative causes of her complaints. He wholly fails to perform a differential diagnosis. In a case also involving head trauma, the First Department made clear that the trial Court must, in the first instance, examine the claims and preclude those that are mere speculation. The Court's attention is respectfully directed to <u>Guzman v. 4030 Bronx Blvd Associates, LLC</u>, 54 AD3d 42, 861 NYS2d 298 (1st Dept 2008). In <u>Guzman</u>, the infant plaintiff had a history of head trauma: he was struck by a baseball in 2000; a

bathroom ceiling collapsed upon him in 2001; he was struck by a basketball in 2002; he was in a rollover MVA in September of 2004; and in another MVA in October of 2004. The action, arising out of a bathroom ceiling collapse, alleged that plaintiff experienced post-traumatic headaches as a result of a head injury with loss of consciousness and suffered various impairments consistent with a history of head trauma. Plaintiffs disclosed an expert neuropsychologist who was going to testify as to the diminution of plaintiff's cognitive and intellectual abilities and as to the significant diminution of plaintiff's post accident cognitive functioning from its pre-accident state. The expert concluded that plaintiff suffered traumatic brain injury as a result of the ceiling collapse. Following jury selection, the defendant moved in limine to preclude the proposed testimony by the plaintiffs' neuropsychologist, arguing that (1) the expert's opinion that plaintiff's injuries were the result of the 2001 ceiling collapse was insufficient to establish causation because it was not based on any objective evidence in the record; (2) that the expert's examinations of the plaintiff were flawed because he did not review plaintiff's prior records prior to the issuance of his reports, which indicated that the problems the expert claimed plaintiff suffered as a result of the accident already existed; (3) the expert failed to take into consideration that plaintiff had a prior accident and a subsequent accident and that the CT scan taken on the day of the injury came back negative. The trial court granted the motion and precluded the testimony.

In affirming the trial court, the First Department wrote:

> . . [The expert] failed to offer or identify any objective medical evidence to support his conclusion that plaintiff's alleged brain injury and resulting cognitive problems were caused by the incident in question. The expert witness first examined the plaintiff and administered neuropsychological tests on June 17, 2004, three years after the injury alleged to have been sustained as a result of the collapse of the bathroom ceiling. **The report dated June 21, 2004 does not identify any earlier testing used as a**

> **basis for the expert's conclusion that the accident suffered in 2001 is the direct and proximal cause of the cognitive deficit documented in this evaluation. Particularly, the report does not refer to any assessment of plaintiff's cognitive function made before the June 2001 incident that might serve as a basis for comparison so as to support the attribution of the noted deficits to events subsequent to the assessment, even if not to the June 2001 incident itself.** A later evaluation made by plaintiff's expert in October 2006 . . . does not even mention the September 2004 car accident, let alone attempt to assess its effect on plaintiff's cognitive function. Moreover, when faced with objective medical evidence indicating the absence of brain injury, such as negative CT scans, plaintiffs' expert dismissed it without sufficient explanation. In fact, all CT scans taken in connection with injuries sustained by plaintiff resulted in negative findings. Nor did [the expert] adequately address evidence showing that plaintiff's cognitive difficulties predated the subject accident.

Id. at ___, 861 NYS2d at 303-304 (citations omitted). The First Department concluded that the trial court correctly decided that plaintiffs' expert failed to establish a sufficient evidentiary foundation with respect to causation, and that the expert was properly precluded from testifying at trial. Other than by rubber stamping Plaintiff's claim that she was in good health pre-accident (which is in fact false), there is no ability for Dr. Shumsky to render a non-speculative opinion with regard to causation. See, e.g. Euvino v. Rauchbauer, 71 AD3d 820, 897 NYS 2d 196 (2d Dept, 2010); Ovalles v. Herrera, 89 AD 3d 636 (1st Dept, 2011).

The fact that Dr. Shumsky ignores the CT scan with evidence of a degenerative change causative of the same symptoms, ignores her history of migraines, and Dr. Ma's belief that her symptoms were in response to a long history of analgesics, in effect, evidences Dr. Shumsky (and Dr. McCoy) are doing nothing more than bolstering Plaintiff's testimony. See, e.g., Easley v. The City of New York, 189 AD 2d 599, 592 NYS 2d 690 (1st Dept, 1993). See, also Guzman v. 4030 Bronx Boulevard Assoc., LLC, 54 AD 3d 42, 861 NYS 2d 298 (1st Dept, 2008). It follows that Plaintiff's doctors should be precluded from testifying as to causation at the trial of

this action. As pointed out by Dr. Barr, Dr Shumsky makes no attempt at a differential diagnosis. By his own testimony, Dr. Shumsky effectively starts with the assumption of a temporal causal relationship. Regardless, he makes no attempt at a differential diagnosis. A "differential diagnosis" is a "patient-specific process of ruling out potential causes of an illness as unlikely until one case remains. "Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 251 (2d Cir. 2005). In In Re: Fosamax Products Liability Litigation. 924 F. Supp. 2d 477 (SDNY, 2013), the Court precluded the testimony of Plaintiff's causation expert for the failure to address alternate causes of Plaintiff's symptoms. The Court wrote:

> Dr. Breiman is precluded from offering specific causation testimony for the same reason Dr. Buch's testimony on that subject is precluded: Dr. Breiman testified that he did not "have enough information" to determine whether Fosamax caused her ONJ. "While an expert need not rule out every potential cause in order to satisfy Daubert, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *Israel v. Spring Indus., No. 98 Civ. 5106, 2006 U.S. Dist. LEXIS 80863, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3, 2006).* Here, Dr. Breiman admitted that he could not eliminate other potential causes, rendering his testimony inadmissible. *Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 202 (4th Cir. 2001)* ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.").

> Plaintiff's argument that Merck is attempting to use Daubert as both a sword and a shield is irrelevant, as the Court's ruling only goes to whether Dr. Breiman can testify as to specific causation. The Court will not rule as to other proposed testimony until it is presented with the deposition designations.

In In Re: Fosamax Products Liability Litigation. 924 F. Supp. 2d 477 (SDNY, 2013).

It cannot be disputed that Dr. Shumsky did not perform a differential diagnosis, but simply used the temporal proximity of the Walmart incident to establish causation. In Derienzo

v. Metropolitan Transportation Authority 694 F. Supp. 2d 229; (SDNY, 2010), a detailed

analysis of these issues was discussed :

> Plaintiff asserts that his treating physicians employed a differential diagnoses in concluding that the May 4 Surgery caused his tumor to hemorrhage. (*See* Pl.'s Mem. 9-12.) "A differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the most likely cause of a set of signs and symptoms from a list of possible causes." *Ruggiero, 424 F.3d at 254* (citation and internal quotation marks omitted). When an expert relies on a differential diagnoses to "'rule out' other potential causes for the injury at issue, he must also 'rule in' the suspected cause, and do so using scientifically valid methodology." *Id.* (citations omitted); *see also In re Fosamax Prods. Liab. Litig., 688 F. Supp. 2d 259, 2010 U.S. Dist. LEXIS 6931, at \*22-24.* "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." *In re Fosamax Prods. Liab. Litig., 688 F. Supp. 2d 259, 2010 U.S. Dist. LEXIS 6931, at \*23* (quoting *Israel v. Springs Indus.., No. 98 Civ. 5106, 2006 U.S. Dist. LEXIS 80863, at \*20 (E.D.N.Y. Nov. 3, 2006)).*

> A district court "has broad discretion in determining whether in a given case a differential diagnosis is enough by itself" to prove causation. *Ruggiero, 424 F.3d at 254.* **However, an expert's opinion should be grounded in more than the mere temporal proximity between a plaintiff's symptoms and the alleged cause of the symptoms.** ***See Washburn v. Merck & Co., No. 99-9121, 2000 U.S. App. LEXIS 8601, at \*5 (2d Cir. 2001)*** **(affirming exclusion of expert testimony as unreliable where the conclusion that defendant's vaccine caused plaintiff's injuries "was based on little more than temporal correlation between [plaintiff's] vaccination and the onset of symptoms");** *Springs Indus., 2006 U.S. Dist. LEXIS 80863, at \*21* (excluding expert testimony on causation [\*\*20] where sole justification for the opinion was "a temporal correlation between the onset of [plaintiff's] symptoms and the presence of the alleged cause.").

> \*\*\*

> **There is no evidence that Dr. Pikus engaged in a differential diagnosis, or any other admissible scientific process, before concluding that plaintiff's May 4 Surgery was what caused his tumor to hemorrhage. Plaintiff, therefore, has failed to meet**

his burden of proving that Dr. Pikus's testimony is sufficiently reliable under *Rule 702* and *Daubert*.

**Even more significant is that Dr. Pikus identified, but failed to exclude, alternative causes of plaintiff's apoplexy that are unrelated to his May 4 Surgery.** In Dr. Pikus's case study, which plaintiff relies on as evidence that Dr. Pikus's opinion is based on a reliable scientific method, Dr. Pikus identified a number of possible alternative causes of plaintiff's apoplexy, including "that the development of the syndrome in this patient was a spontaneous and unhappy coincidence." (Case Study at 4.) Dr. Pikus's failure to "address [the identified] alternative causes and provide a reasonable explanation for dismissing" them renders his testimony inadmissible. *In re Fosamax Prods. Liab. Litig., 688 F. Supp. 2d 259, 2010 U.S. Dist. LEXIS 6931, at \*23* (quoting *Springs Indus., 2006 U.S. Dist. LEXIS 80863, at \*20)*.

****

However, a differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation. **Thus, if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony.")** (citations omitted); *In re Fosamax Prods. Liab. Litig., 2009 U.S. Dist. LEXIS 109366, at \*22-24* (holding that testimony from a treating physician is inadmissible because, among [\*\*27] other failures, the physician failed to rule out known potential causes of plaintiff's injuries); *Munafo v. Metro. Transp. Auth., Nos. 98 Civ. 4572, 00 Civ. 0134, 2003 U.S. Dist. LEXIS 13495, at \*55-59 (E.D.N.Y. Jan. 22, 2003)* (excluding expert opinion on causation from a treating psychopharmacologist, and holding that "[i]n lieu of any conscientious attempt to rule out [identified] alternative factors, [the proposed expert's] causation determination barely rises above mere speculation and cannot meet the reliability standards of expert testimony under Daubert."). [Emphasis added].

<u>Derienzo v. Metropolitan Transportation Authority</u> 694 F. Supp. 2d 229; (SDNY, 2010).

Standing alone, the temporal proximity between plaintiff's injury and the proposed cause of his injury is insufficient to satisfy the requirements of *Rule 702. See Washburn, 2000 U.S. App. LEXIS 860*; <u>In re Fosamax Prods. Liab. Litig.</u>, 2009 U.S. Dist. LEXIS 109366, at \*22-26 (finding

34

proposed expert testimony on causation to be "derived from a 'subjective belief rather than from scientific knowledge and methodologies" when the expert provided "no other reasoning for his diagnosis other than the temporal relationship) *Springs Indus., 2006 U.S. Dist. LEXIS 80863, at *21-22* (excluding testimony where expert "based his opinion on what he viewed as a temporal correlation between the onset of [plaintiff's] symptoms and the presence of the alleged cause."). When combined with Dr. Shumsky's clear lack of knowledge of pre-existing condition testimony regarding causation by him is not admissible.

Of fatal import, Dr. Shumsky does not explain how his opinion that the single bump sustained by Ms. Carlucci was sufficient to cause her a traumatic brain injury, when the prevailing scientific community is of the opinion that "there's no evidence that a single mild TBI increases dementia risk". *Alzheimer's Association on Traumatic Brain Injury.* A single head injury that knocks you out for less than thirty minutes is not likely to cause permanent injury, it is multiple trauma such as a football player sustains which increases risk. *Mayo Clinic.org.* Just as in toxic tort cases, there is substantial evidence that there is a dose response relationship between frequency of injury and the effect the injuries have. *Chronic Neuropathologies of Single and Repetitive TBI: substrates of dementia? Nature Reviews Neurology 9, 211-221 (April 2013)* (Noting that numerous epidemiologic studies could not confirm a causal relationship of even a single moderate trauma, and that generally loss of consciousness is a material factor of the dose response.)

The Court of Appeals addressed in <u>Cornell v. 360 West 51st Street Realty, LLC.</u>, 2014 WL 1237483 (2014) the necessary standard by which a plaintiff must establish the existence of specific causation. Referring to its prior decision in <u>Parker v. Mobil Oil Corp.,</u> 7 N.Y.3d 434 (2006), (where the Court of Appeals set forth the foundation necessary to admit expert evidence),

the Court of Appeals stated that while <u>Parker</u> explains that a precise quantification of exposure, or an exact response relationship, is not necessary to establish specific causation, it still remains plaintiff's burden to establish sufficient exposure to a substance so as to constitute a substantial contributing cause of the claimed adverse health effect. Further, the Court went on to evaluate in <u>Cornell</u> the failure by plaintiff's specific causation medical expert to sufficiently establish through a differential diagnosis or other means a basis for concluding that plaintiff's medical problems were related to coke oven emissions. Consistent with <u>Cornell</u>, this Court must find:

   (a)  There has been no detailed examination of Plaintiff's dose exposure, and no scientific acceptance that a single mild blow can cause permanent injury;.

   (b)  That the reports and arguments of Plaintiff's counsel fail to meet that standard set forth in *Cornell*, wherein the Court set forth:

> First, the Appellate Division is incorrect to the extent that it suggests that performance of a differential diagnosis establishes that a plaintiff has been exposed to enough of an agent to prove specific causation. This is not what we meant when we stated that "precise quantification" of exposure was not necessary, and there exist alternative "potentially acceptable ways to demonstrate [specific] causation" (*Parker*, 7 N.Y.3d at 448, 449). In any event, this record does not supply a proper foundation for Dr. Johanning's differential diagnosis.

Here, the mere fact that Dr. Shumsky states that Plaintiff sustained a mild blow to the head is insufficient to, without more, meet the test of reliability in establishing of causal relationship of Plaintiff's alleged cognitive difficulties. Dr. Shumsky barely notes plaintiff's medical history, does not explain how he analyzed prior complaints as potential causes and substantial contributing factors to plaintiff's alleged cognitive complaints and simply assumes Ms. Carlucci's baseline was normal. He makes no analysis, looks at no test results, and makes no diagnostic findings with regards to these factors. The Court of Appeals in <u>Cornell</u> clearly rejects such

analysis as it stated:

> As Dr. Phillips attested, many of the medical conditions that
> Cornell attributes to her mold exposure (e.g., asthmatic symptoms)
> are common in the general population; additionally, many of her
> symptoms may be ascribed to non-mold-related diseases. Yet, Dr.
> Johanning does not explain what other possible causes he ruled out
> or in, much less why he did so. He states that he performed a
> panoply of diagnostic tests, but does not give any results. Dr.
> Phillips, upon review of Cornell's medical records, stated that
> physical findings and laboratory data did not substantiate mold-
> related illness; for example, Cornell tested negative for mold
> allergies, but positive for other inhalation allergies. Dr. Johanning
> does not dispute this, or explain how any of the diagnostic findings
> are consistent with his differential diagnosis. Instead, he broadly
> states his conclusion that Cornell's medical problems are mold-
> induced, based on differential diagnosis.

Cornell, annexed hereto at p. 12.

The decision in Israel, *supra*, is very instructing in establishing the inadmissibility of Dr.

McCoys life plan.   Dr. McCoy relies heavily on Dr. Shumsky, whose lack of knowledge on

causation renders his own opinion speculative.   Further, Dr. McCoy admits many items included

in his life care plan are never prescribed by a doctor: In Israel, *supra*, the Court wrote:

> The main problem with the Life Care Plan is that it relies on Dr.
> Carfi's conclusions about causation and does not attempt to
> separate out which costs relate to which conditions. In his
> deposition, Dr. Carfi testified that, in his opinion, the future
> costs reflected in the Life Care Plan are all linked to Joseph's exposure
> to the sheets. (Carfi Dep. at 104.)
>
> ****
>
> Again, however, Dr. Carfi conceded that he could not identify any
> medical record that suggested a connection between Joseph's
> multiple chronic conditions - such as his asthma and his severe
> food allergies - and his exposure to synthetic fibers. (Id. at 105.)
> When asked at his deposition whether he could "say for certain that
> none of the costs that are reflected in [the] Life Care Plan were
> necessitated by any condition that Joseph was born with," Dr. Carfi
> [*28]  answered, "I couldn't say that with confidence. I was not
> told of any serious condition that he had prior to that synthetic

exposure." (Id. at 105-06.) This reflects a serious flaw in Dr. Carfi's methodology. For example, Dr. Carfi estimates that Joseph will require Neocate, at a cost of approximately $ 30,335.71 per year, for the remainder of his life. (Life Care Plan, annexed as Ex. CC, Part 3, to Pls.' Opp'n.) Yet he cites no scientific studies, peer-reviewed articles, or other research that indicates that there could be any causal connection between exposure to polyester and severe food allergies. The Life Care Plan also estimates that Joseph will incur $ 3,900 in annual costs, for the rest of his life, for visits to a pulmonary specialist to monitor Joseph's lungs. Yet, again, Dr. Carfi cites no reliable medical evidence to show a causal connection between polyester exposure and asthma. Nor does he reference any scientific evidence to support his assumption that Joseph will continue to experience his current symptoms permanently. [15] Since he has no direct experience treating patients with allergies similar to Joseph's, Dr. Carfi's Life Care Plan is speculative and is therefore inadmissible.

Israel v. Springs Industries, Inc. 2006 U.S. Dist. LEXIS 80863(EDNY, 2006). Dr. McCoy watched Ms. Carlucci on a single half-day, and drew conclusion based upon assumptions. He testified that **he knew the business so he did not need to see more.**

Compare this to the very similar analysis done by Plaintiff's expert in Israel, which the Court rejected. In Israel, the Court noted:

To assist in determining whether Dr. Carfi reached his conclusion using proper methodology, the court may consider whether his "theory or technique . . . can be (and has been) tested." *Daubert, 509 U.S. at 593.* Clearly, spelling tests and math problems assist educators in evaluating a child's skills. However, the four addition problems and four spelling problems that Dr. Carfi gave to Joseph were not from any educational guide, but were culled solely from his "own parental experience" (Carfi Dep. at 58), as Dr. Carfi has no educational credentials. (Id. at 59, 65.) Plaintiffs do not suggest that this method of assessment was tested, and it apparently was not.

2.    **DR. GREENWALD**

Just as with Dr. Shumsky, Dr. Greenwald makes no differential diagnosis. He relies on Dr. Shumsky's evaluation that Plaintiff has a mild TBI, and he concludes that. He does not

address her prior complaints, or the extensive prescription drug use to treat her prior conditions. He specifically does not address her cerebral cortical atrophy. He does not explain why Dr. Kozer found her to be high functioning, with a high test score, and that she needed no further neurologic follow up except encouragement. He does not explain why Dr. Shumsky's test results are essentially within normal limits. He does not explain why the headaches are diagnosed as likely to be related to analgesic rebound headaches, or the fact that Plaintiff's sleep disorder is from obstructive sleep apnea ( the airway collapses or becomes blocked during sleep. This causes shallow breathing or breathing pauses. Symptoms include daytime sleepiness or fatigue, morning headaches and attention problems.) . He addresses none of this in his analysis or conclusion. He does not address the findings made by Dr. Barr.

Also, from a science standpoint, he does not explain how a single minor blow is scientifically accepted to cause a permanent affect, especially without follow up objective MR study to correlate the injury. None of the articles he cites confirm his conclusion. While some talk about the effect of repetitive mild TBI in athletes or soldiers, he does not identify epidemiological evidence that the medical community accepts that a single isolated mild concussion (TBI) causes the significant permanent affects being alleged by Ms. Carlucci. His testimony, for the legal reasons set forth herein, must be precluded.

### 3.    DR. McCOY

Finally, Dr. McCoy opines that Jennie's business is in severe jeopardy, a conclusion clearly reached as an advocate and not as an expert witness. He does not explain the foundation for this conclusion, other than stating conclusorily that she is running her son into the ground. This opinion is not grounded in "methods and procedures of science," but simply reflects Dr.

McCoy's "subjective belief or unsupported speculation." See Daubert, *509 U.S. at 589*. It is therefore inadmissible.

Dr. McCoy admits he made no examination of the business pre-accident. He just assumes it was well run. Yet the business does not prosper until after the accident. Is that because Ms. Carlucci was always poor at running it? Or did she simply need more people or provide more services? This is never explained.

> An expert may incorporate assumptions into his or her opinion, but those assumptions must be ones that a reasonable juror could find correct based on admissible evidence. See *Amorgianos v. Nat'l R.R. Passenger Corp., 137 F. Supp. 2d 147, 176 (E.D.N.Y. 2001)*, aff'd, *303 F.3d 256 (2d Cir. 2002)*. See also *TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993)* (expert could not rely on the figures calculated by another expert when the proffered expert did not conduct any investigation of the other expert's figures); *Total Containment, Inc. v. Dayco Prods., Inc., 2001 U.S. Dist. LEXIS 15838, No. Civ. A. 1997-CV-6013, 2001 WL 1167506, at *6-7 (E.D. Pa. Sept. 6, 2001)* (excluding expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions); *Otis v. Doctor's Assocs., Inc., 1998 U.S. Dist. LEXIS 15414, No. 94 C 4227, 1998 WL 673595, at *4 (N.D. Ill. Sept. 14, 1998)* (precluding proffered expert's opinion on anticipated lost profits where plaintiff had shown no evidence that the expert's calculations were "anything more than an exercise in arithmetic based on inherently unreliable values."). In other words, the expert's underlying assumptions must be evaluated for accuracy.

Israel v. Springs Industries, Inc, 2006 U.S. Dist. LEXIS 80863(EDNY, 2006). The Curt was quick to reject mere unsupported conclusions:

> Dr. Freifelder's underlying assumptions are problematic in a few respects. First, in determining Joseph's pre-incident earning capacity, he assumes that, had Joseph not been exposed to the polyester in the crib sheets, he would have had a normal work life expectancy, meaning he would have been "able to work as a typical male[.]" (Freifelder Dep. at 78.) **His calculations do not take into account the possibility that some of Joseph's medical conditions were pre-existing and would have affected Joseph's work life regardless of his purported exposure to polyester. In**

40

> **other words, Dr. Freifelder accepted, for purposes of projecting Joseph's pre-incident earning capacity, that Dr. Carfi's opinion on causation was scientifically valid.** This is also true with respect to Dr. Freifelder's projections on Joseph's future health care costs. Dr. Freifelder's estimates are based entirely on Dr. Carfi's Life Care Plan for Joseph, which links all of Joseph's medical expenses to his alleged early exposure to polyester crib sheets. [30]
>
> **The flaw in Dr. Freifelder's analysis lies in his underlying assumptions, which lack any reliable foundation.** As explained in detail above, Dr. Carfi's opinion on causation is inadmissible under *Daubert* - with the possible exception of his opinion on the causation or exacerbation of Joseph's eczema - because it is not grounded in any identifiable scientific methodology. Since Dr. Freifelder's assumptions are based on Dr. Carfi's conclusions, or are otherwise unsupportable, his opinions are likewise inadmissible. [Emphasis added]

("[T]rial-court discretion in choosing the manner of testing expert is not discretion to abandon the gatekeeping function . . . . [or] to perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise that is *fausse* and science that is junky."); *Amorgianos, 303 F.3d at 265* ("[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under *Rule 702*-it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (quoting *Daubert, 509 U.S. at 597*)).  See Kunho Tire Co., *supra*, 526 US 137 at 158-159.

Dr. McCoy cannot rely upon a temporal relationship because factually Carlucci Homes is doing better post accident.  In Della Hough-Scomav v. Wal-Mart Stores, Inc., 1999 U.S. Dist. LEXIS 7046 (WDNY, 1999) "... less than one year after the accident the plaintiff, a registered nurse, went back to work at the same hospital where she worked prior to the accident, but alleged she is not performing the same duties that she performed prior to the accident." The plaintiff testified that her restrictions resulting from her sustained injury prevent her from performing the full range of duties normally required of a registered nurse. There was no claim that her salary

41

had decreased. Her doctor testified that the plaintiff's injury was to some extent permanent in that he did not believe the plaintiff would ever regain a normal cervical range of motion. Another doctor concluded that the plaintiff will have to retire early appear that the matter was ever resolved or that the tables were ever admitted into evidence. In rejecting the claim for future loss of earning capacity, the Court found the testimony conclusory and speculative, which is no different than the situation here where Plaintiff claims she works double the hours than she did before, but needs three people to do the work she cannot complete, and her income has almost doubled.

## II.  SECOND MOTION TO PRECLUDE OPINIONS BY DR. McCOY and MR. KENNETT BASED ON FACTS NOT IN EVIDENCE

This aspect of the motion in limine seeks to preclude the introduction of testimony of Dr. McCoy, as Plaintiff's "life care plan" expert as to treatment not identified as needed by a testifying treating physician.. Dr. McCoy is an expert, and not a treating Doctor, and he may only testify upon facts in evidence. To the extent facts are not in evidence, they should not be permitted in the life care plan. This motion relies upon Hyatt v. Metro-North Commuter Railroad, 16 A.D.3d 218, 792 N.Y.S.2d 391; (1st Dept, 2005), the First Department stated:

> "There is no indication that plaintiff was seeing a physical therapist for more than a year before trial, and his treating physician's testimony that he "imagined" plaintiff would need to see one regularly in the future is speculative (see [*220] Guerrero v Djuko Realty, 300 AD2d 542, 752 NYS2d 694 [2002], lv denied 100 NY2d 501, 790 NE2d 1193, 760 NYS2d 764 [2003]; Jansen v Raimondo & Son Constr. Corp., 293 AD2d 574, 741 NYS2d 71 [2002]; [***6] Liebman v Otis El. Co., 145 AD2d 546, 536 NYS2d 100 [1988])." [Emphasis added]

Plaintiff has not been deposed since early 2013, but Plaintiff's counsel, other than trial subpoenas, has served no authorizations for treatment records of the Plaintiff. There is

absolutely no mention of recent treatment of Plaintiff in the McCoy report. except of an x-ray in April of 2013, more than a year before his report.

Dr. McCoy is not a treating doctor, and as an expert, he may only comment upon those procedures which the admitted evidence discloses that Plaintiff's treating doctors have recommended.   Allen v. Uh, 82 A.D.3d 1025 (2d Dept 2011)   See, e.g., Hornbrook v. Peak Resorts, 194 Misc.2d 273, 754 N.Y.S.2d 132 (Tomkins County 2002); Brittingham v. Smith, 2014 N.Y. Misc. LEXIS 439, 2014 N.Y. Slip Op 3028(U) (Suffolk County 2014).  (If he was a treating doctor, having first seen Plaintiff seven years post accident, any claim for the need of accident caused future treatment would be speculative in any event as outlined above.)

In the Hornbrook case cited above, the Court went through an identical analysis as defendant is requesting herein.  Plaintiff had a myriad of treating doctors, and then was sent to an expert by his attorneys.  In Hornbrook, the expert examined the plaintiff once.  Here, the expert examined the Plaintiff twice, but only because the trial was repeatedly adjourned.  There is little difference in the analysis reached by the Court in Hornbrook and the analysis this Court must make herein.  Ultimately, this Court must find:

> "Not surprisingly, therefore, the case law consistently holds that a non-treating expert may not testify based on the report of another physician, where the report is not independently admitted and the other physician is not a witness at trial." (Friedman, *Need for a Testifying Physician To Rely on Reports by a Non-Testifying Physician Poses Evidentiary Problems,* 73 NY St BJ 9, 28-29 [Nov./Dec. 2001].)
>
> Where a treating doctor refers a patient to a consulting doctor for evaluation and the resulting report is used by the referring [*277] doctor in order to treat the patient, the reliability of the report is evident.  Here, the out-of-court materials were generated by a series of treating doctors but were not used by the testifying doctor to treat the patient. Hence, it is not the reliability of the out-of-court materials that gives pause but the use to which these records and reports will be put by the testifying but nontreating expert."

Hornbrook v. Peak Resorts, 194 Misc.2d 273, 754 N.Y.S.2d 132 (Tomkins County 2002).

Allen v. Uh, 82 A.D.3d 1025 (2d Dept, 2011) (the numerous citation omitted).

**Amounts set forth in a life care plan, or future medical expenses, must be excluded unless it is both supported by admissible evidence and not speculative** (see, e.g. Mayzel v. Mortetti, 105 A.d.3d 816, 962 N.Y.S.2d 656, Roman v. Bronx-Lebanon Hospital Center, 51 A.D.2d 529, 379 N.Y.2d 81). In Placakis v. City of New York, 289 A.D.2d 551, 736 N.Y.S.2d 379; (2001), the Court stated:

> "However, it was not error for the court to refuse to submit the issue of future medical expenses to the jury, since the plaintiffs failed to establish "a probability supported by some rational basis," upon which the jury could render a nonspeculative verdict with regard to future medical expenses (*Matter of Miller v National Cabinet Co.,* 8 N.Y.2d 277, 282; *see, Gross v Friedman,* 138 A.D.2d 571, *affd* 73 N.Y.2d 721; *Matott v Ward,* 48 N.Y.2d 455, 460; *Kavanaugh v Nussbaum,* 129 A.D.2d 559, 563)."

See, Hyatt v. Metro-North Commuter Railroad, 16 A.D.3d 218, 792 N.Y.S.2d 391; 2005 N.Y. App. Div. LEXIS 2490 quoted above. See also, Jansen v. C. Raimondo & Son Construction Corp., 293 A.D.2d 574; 741 N.Y.S.2d 71; (an award of $110,000 for future occupational therapy reduced $6,750 as speculative)."

In accordance with the foregoing, the future care plan testimony of Dr. McCoy should be limited and/or precluded. The alleged need for future surgeries and treatment such as physical therapy is speculative, especially as a causally related circumstance to the accident and given Plaintiff's lack of recent treatment. The future care plan, and its proponent, must be limited to the facts in evidence. As set forth at pp. 34 above, almost the entire plan is unsupportable as speculative, unsupported by admissible testimony, and cannot meet the standards set forth by Daubert.

A.    **PLAINTIFF'S LOST EARNINGS VALUATION
CLAIM SHOULD BE DISMISSED**

The testimony of Mr. Kennett lacks evidentiary foundation by reason of the foregoing

discussion regarding the need for his testimony to be based upon admitted evidence. "Claims for

lost earnings must be ascertainable with a reasonable degree of certainty and may not be based

on conjecture." Glaser v County of Orange, 54 AD3d 997, 998, 864 N.Y.S.2d 557 (2d Dept

2008) (internal quotation marks and citations omitted); see also Schiller v New York City Tr.

Auth., 300 AD2d 296, 296-97, 750 N.Y.S.2d 774 (2d Dept 2002); Davis v City of New York,

264 AD2d 379, 379-80, 693 N.Y.S.2d 230 (2d Dept 1999). **It is the Plaintiff's burden to

establish damages for past and future lost earnings with reasonable certainty, such as by

submitting tax returns or other relevant documentation'." Lodato v Greyhawk N. Am.,

LLC, 39 AD3d 494, 495-96, 834 N.Y.S.2d 239 (2d Dept 2007) (quoting Karwacki Astoria

Med. Anesthesia Assoc., P.C., 23 AD3d 438, 439, 808 N.Y.S.2d 123 (2d Dept 2005).    See**

Lane v. Smith, 84 A.D.3d 746, 922 N.Y.S.2d 214 (2d Dept 2011).

Further, unless a claimed disability is observable and appreciated by laypersons, a lost

earnings claim requires "medical testimony connecting plaintiff's injuries to plaintiff's claimed

inability to work. Razzaque v Krakow Taxi, Inc., 238 AD2d 161, 162, 656 N.Y.S.2d 208 (1st

Dept 1997); see also Szynalo v Barretti Carting Corp., 304 AD2d 558, 559, 756 N.Y.S.2d 904

(2d Dept 2003); Easley v City of New York, 189 AD2d 599, 601, 592 N.Y.S.2d 690 (1st Dept

1993).

Court's have universally held that the lost earnings claim, therefore, is comprised of

several interrelated elements, on each of which the plaintiff bears the burden of proof:  medical

evidence of disability negating the ability to work; proof of causation in fact, primarily the

difference between "the plaintiff's earning capacity before and after the accident" (see Harris v

City of New York, 2 AD3d at 784); and proof of the amount of the loss, including necessary documentation and fair calculation.   To present a loss of earnings claim there must be clear medical evidence of causal relationship, and concrete evidence of the loss.  Lane v. Smith, 84 A.D.3d 746, 922 N.Y.S.2d 214 (2d Dept 2011) (Plaintiff must present competent medical evidence of an inability to work.  See also Miah v. Private One 23 Misc 3d 1133 A, 898 NYS 2d 883, (Kings County, 2009)

The case law is amply clear that a claim for lost profits requires that the evidence to be submitted renders the lost profits ascertainable within a reasonable degree of certainty.  St. Lawrence Factory Stores v. Ogdensburg Bridge and Port Minority; 26 AD3d 700; 810 NYS2d 532; (3d Dept. 2006). Plaintiff here simply makes conclusory claims that her business would have continued to grow if her son did not take over many of her functions, and if others were not hired.  There is no analysis or admissible evidence on this.    See, e.g., St. Lawrence Factory Stores v. Ogdensburg Bridge and Port Minority, 26AD3d 700, 810 NYS2d 532 (3d Dept. 2006).

Moreover, Plaintiff's business is growing and she is making proportionately more money as it grows.   Plaintiff's claim herein is nothing more than assumptions, speculation and conjecture, and the fact that the plaintiff is claiming over a million dollars in lost income when her income has, in fact, significantly increased, requires a detailed and documented explanation. Zink v. Mark Goodson Productions, Inc., et al., 261 AD2d 105, 689 NYS2d 87.  See also Awards.com v. Kinko's, supra, 42 AD3d 178, 834 NYS2d 147, (1st Dept. 2007). See also Harris v. City of New York 2 AD 3d 782, 770 NYS 2d 380 (2d Dept, 2003) (The opinion of a vocational economist (here Mr. Kennett) who simply assumes plaintiff cannot perform any future work is of no probative value and the claim should be dismissed.)

In Celebrity Cruises Inc., v. ESSEF CORP., 434 F. Supp. 2d 169; 2006 U.S. Dist. LEXIS

36319 (SDNY, 2006) the Court rejected faulty economic loss analyses under Daubert.  there is

absolutely no technical analysis to show that the additional employees hired (in significant part

in 2012, 3 years post accident and after substantial growth) are related to some deficiency of the

plaintiff.  The theory that Ms. Carlucci's business grew 87.7%, but that her own personal income

growth was stunted by the additional hires, because she only made on 70% more money during

the same period comes with no documentary support and seems to be tantamount to a frivolous

claim.  "The entrepreneur's 'cheerful prognostications' are not enough" to support a loss of

earnings claims Schonfeld v. Hilliard, 218 F.3d 164, 173 (2d Cir. 2000) (quoting *Dobbs Law of*

*Remedies* § 3.4). Celebrity Cruises Inc., v. ESSEF CORP., 434 F. Supp. 2d 169; 2006 U.S. Dist.

LEXIS 36319 (SDNY, 2006)

In evaluating similar type analyses, the Court in Faulkner v.- Arista Records LLC, 2014

U.S. Dist. LEXIS 129711(SDNY, 2014) rejected the testimony of an expert who failed to review

both existing data, and who failed to explain clear opposing arguments as to his conclusions.

The Court explained;

> "The Daubert analysis focuses on the principles and methodology
> underlying an expert's testimony, not on the expert's conclusions.
> *In re Fosamax, 645 F. Supp. 2d at 173-74* (citing *Daubert, 509
> U.S. at 595*). However, the Supreme Court in Joiner recognized
> that "conclusions and methodology are not entirely distinct from
> one another." *522 U.S. at 146*. Therefore, [*24]  "[a] court may
> conclude that there is simply too great an analytical gap between
> the data and the opinion proffered." Id. (stating that "nothing in
> either Daubert or the Federal Rules of Evidence requir[es] the
> admission of opinion evidence connected to existing data only by
> the ipse dixit of the expert.") The ultimate object of the court's
> gate-keeping role under *Rule 702* is to "make certain that an
> expert, whether basing testimony upon professional studies or
> personal experience, employs in the courtroom the same level of
> intellectual rigor that characterizes the practice of an expert in the
> relevant field." *Kumho Tire, 526 U.S. at 152.* "The flexible

Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos, 303 F.3d at 267*. Finally, like all evidence, expert testimony may be excluded under *Rule 403* if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Fed. R. Evid. 403*.

\*\*\*\*

Courts in this district have found that an expert report lacked reliability where the expert did not review data he believed to be [\*36] unavailable, when the data was, in fact, produced. See *Lippe v. Bairnco Corp., 288 B.R. 678, 694 (S.D.N.Y. 2003)* aff'd, *99 F. App'x 274 (2d Cir. 2004)*; see also *Celebrity Cruises Inc. v. Essef Corp., 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006)* (excluding damages expert who was not aware of availability of "actual performance data" because she "declined to incorporate their actual growth rates into her methodology" once she became aware of data).

\*\*\*\*

Any background information that Mr. Coleman required to compare the records to "source" documents could have been specifically requested at the outset of expert discovery. Mr. Coleman's refusal to ask for such evidence, his failure initially to review of many categories of records, and his disregard of such relevant records after his belated review indicate that his methodology was aimed at achieving one result. Such analysis is unreliable, and therefore Mr. Coleman's opinion about Arista's records must be excluded. See *E.E.O.C., 2010 U.S. Dist. LEXIS 92511, 2010 WL 3466370, at \*17* ("[t]o ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [an expert's] methodology."

\*\*\*\*

Plaintiffs' explanation for ignoring Arista's historical records, explained in Mr. Coleman's supplemental declaration, is that the documents identified by Arista that Mr. Coleman did not initially review are "not of a type an auditor would rely on to verify the accuracy and completeness of documents." Coleman Decl. ¶ 43. **As discussed earlier, this summary rejection was not reliable because the methodology behind expert analysis should be made to produce results, not to justify the results already**

> reached. See *E.E.O.C. v. Bloomberg L.P.*, *Civ. No. 07-8383 (LAP)*, *2010 U.S. Dist. LEXIS 92511, 2010 WL 3466370, at *17 (S.D.N.Y. Aug, 31, 2010)* ("To ignore contradictory testimony in order to arrive at a desired conclusion highlights the unreliability of [expert's methodology.")
>
> The appearance that Mr. Coleman's methodology is result-oriented is underscored by Plaintiffs' acknowledgement that "no amount [sic] of answers [from Arista] could have satisfied [Mr. Coleman]." Pl. Opp. at 8 n.7. Additionally, Mr. Coleman had every opportunity to locate such "source documents" in order [*45] to verify Arista's historical records for use in calculating royalties or to compare the foreign royalty data with the data reported by foreign territories. Throughout the extensive discovery and expert discovery in this case, Mr. Coleman did not seek out further documents to verify the Arista records.

## III.    THIRD MOTION IN LIMINE TO PRECLUDE OPINION TESTIMONY FROM MARY FROST

At the place of Plaintiff's accident an L-shaped hang rail was located in front of the boxes in order to keep them from falling from the display shelf. Plaintiff removed one box from behind the L-shaped hang rail with the intention of placing it in her shopping basket. She does not remember whether she turned to her left or to her right to place it into her shopping basket. She was then allegedly struck in the head by one or more boxes from the display shelf.

During her deposition, plaintiff offered no significant testimony or information with respect to how her accident allegedly occurred. She pointed to no portion of the display shelf or the L-shaped hang rail that was allegedly broken or defective at the time of the alleged accident. She offered no expert to say that the safeguards that the defendant had in place at the time were incorrect and/or that the product was not appropriately displayed. She has no idea if or how the box or boxes allegedly came from behind the L-shaped hang rail holding them in place. She could not explain how the box or boxes allegedly struck her in the head when her head was above the height of the display shelf.

During the discovery phase of this proceeding, plaintiff took the testimony of Mary Frost, a former, disgruntled WAL-MART employee who, although she did not work in the store's Furniture Department, opined that the display of boxed bookshelves did not "look safe" because there "was no lip or anything to keep the boxes from falling if they were to get tipped or lean, there was just a small bar to hold them back."

Mary Frost must be precluded at the trial of this action from opining that the subject display looked "unsafe" because there "was no lip or anything to keep the boxes from falling if they were to get tipped or lean, there was just a small bar to hold them back." There has not been and will not be any showing by plaintiff that Ms. Frost is an expert in shelving or designing merchandise displays. She cannot identify any methodology or industry standard from which she drew her opinion. It is based on nothing more than subjective belief and unacceptable speculation. It does not qualify as an expert opinion.

It is true that Rule 701 permits opinion testimony to be provided by lay witnesses in certain situations. The Rule states that "[i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Lay opinion under Rule 701 must be limited to opinions that "result[] from a process of reasoning familiar in everyday life." Fed. R. Evid. 701 advisory committee's note, 2000 amend.

Here, the Court must not allow Ms. Frost to opine about negligent design features of the shelving display in question because there is no rational basis for that opinion. She cannot testify that shelving lips are standard practice in the big box industry or otherwise were required by WAL-MART's own standards. She cannot suggest that shelves with lips are objectively safer

than shelves without lips, or that lips were required to meet WAL-MART's duty to exercise reasonable care for the safety of its customers. She cannot opine that defendant's shelving system required two methods of protection for its customers, both the hang rail or restraining bar that plaintiff admitted was in place at the time of her accident and a shelf lip. She can offer no evidence that defendant's use of the hang rail was insufficient or improper for the merchandise being displayed or that the shelving lip could better serve the purpose of protecting defendant's customers in the furniture aisle of the store. In sum, Ms. Frost has absolutely no foundation for her testimony and is in no better position than the jury to reason out the alleged cause of the purported accident or the plaintiff's injuries. Thus, her opinion testimony must be precluded. This is different than a witness saying an unsafe condition existed because boxes were improperly stacked, or there was no safety device at all. There are legitimate reasons from a design perspective not to have a lip <u>and</u> a safety bar, and if the design of the shelving unit is a trial defect, an expert should explain it.

In fact, Mr. Frost should not be permitted to render such an opinion where engineers licensed in New York have been prohibited from making such claims where they lace specific retail expertise. See <u>e.g.</u> <u>Ruggiero v. Waldbaums Supermarkets</u>, 242 AD 2d 268 (2d Dept, 1997), <u>see</u> <u>Ingram v. Costco</u>, 117 AD 3d 685 (2d Dept, 2014)

## IV.    FOURTH MOTION IN LIMINE: PLAINTIFF'S CLAIM THAT THE DEFENDANT'S SHELVING SYSTEM WAS DEFECTIVELY DESIGNED IN THAT IT REQUIRED A LIP IN ADDITION TO A RESTRAINING BAR IS INADMISSIBLE ABSENT EXPERT TESTIMONY

The design of the defendant's shelving system as it existed on the day of the alleged accident required a patron to slide the boxed bookshelf out from around the restraining bar. A lip on the edge of the shelf would have prevented that process and would have required that patron to lift the bookcase up and over the lip in order to remove it from the shelf. As discussed above,

51

to allow a lay person to opine on these design issues is beyond the province of lay testimony. Further, the jury may not infer such requirements without expert testimony for the same reason. Levenson v. Home Depot U.S.A., Inc., 2014 U.S. Dist. Lexis 1005 (NDNY 2014)  (plaintiff knew or should have known that he needed an expert when he filed his complaint alleging he was injured by fallen rake at big box store).  Expert opinion evidence is required on matters not within the ordinary experience of laypersons.  While some case have held that a store fixture being safe is something a lay juror can determine, here the shelving remit was stacked properly, and being used exactly as intended.  Plaintiff needs to introduce direct evidence of a defect.  See, e.g., Blazynski v. A Garelick & Sons, Inc., 48 AD 3d 1168 (4th Dept, 2008).  See also Ascher v. Target Corp., 522 F. Supp 2d 452 (EDNY, 2007), similar claims to those asserted herein were rejected, including those supported by an alleged expert affidavit.

## V.    FIFTH MOTION IN LIMINE:  PLAINTIFF MUST BE PRECLUDED FROM INTRODUCING EVIDENCE RELATED TO PRIOR INCIDENTS IN MINNESOTA AND TEXAS WAL-MART STORES

Plaintiff will argue at the time of trial that two prior incidents in Minnesota and Texas Wal-Marts serve to provide notice to this defendant that the absence of a "lip, barrier or guard" failed to prevent boxed bookshelves from falling upon customers.  However, evidence of prior accidents are admissible only if the proponent "establish[es] their relevance by showing that they occurred under the same or substantially similar circumstances as the accident at issue. "Lidle v. Cirrus Design Corp., 505 Fed Appx. 72, 74 (2d Cir 2012) (quoting Schmelzer v. Hilton Hotels Corp., No. 05 Civ. 10307, 2007 U.S. Dist. LEXIS 70727, at *5 [S.D.N.Y., 2007]). "Whether a prior accident occurred under 'substantially similar' conditions necessarily 'depends upon the underlying theory of the case, and is defined by the particular defect at issue.'" Id. (quoting Guild

v. Gen. Motors Corp., 53 F. Supp. 2d 363, 367 [W.D.N.Y. 1999] [internal citation and quotation marks omitted]).

Here, the plaintiff has not and cannot establish that the Minnesota and Texas accidents occurred because of an alleged failure to provide a lip on the shelf upon which boxed bookcases were displayed. The Minnesota accident report states only that "bookcase slid off shelf and hit customer." It gives no reason for the movement of the bookcase and does not address whether the shelving system or the hang rail failed in some way or the customer precipitated the accident. The Texas accident report, in contrast, specifically states that the "merchandise fell from: claimant handling." Neither report provides a basis for the conclusion that the accidents occurred under such substantially similar conditions to the one at issue that they can here be admitted into evidence on the issue of whether defendant had constructive notice of the purported defect of failing to provide a lip on a shelf.

## CONCLUSION

Each of the aforesaid motions in limine represent the current state of the law on the admissibility of testimony, and should be granted in all respects.

Dated: New York, New York
      October 8, 2014

_____
SCOTT A. BRODY